IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AIR TRANSPORT ASSOCIATION OF AMERICA, INC., d/b/a AIRLINES FOR AMERICA, <br> 1275 Pennsylvania Avenue NW <br> Washington, D.C. 20004; <br><br> INTERNATIONAL AIR TRANSPORT ASSOCIATION, <br> 1201 F Street, NW, Suite 650 <br> Washington, DC  20004; <br><br>      Plaintiffs, <br><br>    v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE <br> 1400 Independence Ave., S.W. <br> Washington, D.C. 20250; <br><br> THE ANIMAL AND PLANT HEALTH INSPECTION SERVICE, <br> 4700 River Road <br> Riverdale Park, MD 20737; <br><br> DEPARTMENT OF HOMELAND SECURITY, <br> Secretary of Homeland Security <br> 300 7th Street, S.W. <br> Washington, D.C. 20024; <br><br> CUSTOMS AND BORDER PROTECTION AGENCY, <br> 1300 Pennsylvania Ave., N.W. <br> Washington, DC 20229; <br><br> TOM VILSACK, Secretary of Agriculture <br> 1400 Independence Ave., S.W. <br> Washington, DC 20250; <br><br> KEVIN SHEA, <br> Administrator, Animal and Plant Health Inspection Service, | Civil Action No. _____ <br><br><br><br><br><br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

4700 River Road
Riverdale Park, MD 20737;

R. GIL KERLIKOWSKE,
Commissioner, United States Customs and
Border Protection,
1300 Pennsylvania Ave. NW
Washington, DC 20229;

JEH CHARLES JOHNSON,
Secretary of Homeland Security
Washington, D.C. 20528;

                    Defendants.

Plaintiffs, Air Transport Association of America, Inc., d/b/a Airlines for America

("A4A"), and International Air Transport Association ("IATA"), bring this action to redress

Defendants' failure to comply with the Food, Agriculture, Conservation and Trade Act of 1990

(the "FACT Act"), 21 U.S.C. § 136a, and the Administrative Procedure Act ("APA"), 5 U.S.C.

§ 500 *et seq.*

## I. INTRODUCTION

1.      For more than 25 years, commercial airlines and their passengers have been

required to pay Agricultural Quarantine and Inspection ("AQI") fees to cover the cost of

inspecting aircraft, persons, cargo, and baggage on arriving international flights for agricultural

risks.  The statute authorizing those fees—the Food, Agriculture, Conservation and Trade Act of

1990 ("FACT Act")—specifically requires the Animal and Plant Health Inspection Service

("APHIS") to fix fees at a rate "commensurate" with the cost of AQI program inspections for

each class of users paying the fees.  21 U.S.C. § 136a(a)(2).

2.      That provision reflects two related restrictions on the fees that can be lawfully

charged under the FACT Act.  First, the fee for each class of user (*e.g.*, air passengers,

commercial trucks, cruise ship passengers) must be based strictly on AQI inspection costs for that user class.  Second, because fees for each class must be strictly cost-based, APHIS cannot charge one class of user a fee higher than the costs of inspections for that class and use those extra proceeds to pay the AQI inspection costs of another user class, or to pay for some other, unrelated service.  In other words, the FACT Act prohibits APHIS from setting AQI fees above the associated costs of inspecting each user, and it prohibits "cross-subsidizing" other users or non-AQI activities with fees collected from a given user class.

3.      On October 29, 2015, APHIS published a Final Rule that more than *tripled* the inspection fee charged to commercial airlines for each international flight arriving in U.S. customs territory—from $70.75 per flight to $225 per flight.  *See* APHIS, User Fees for Agricultural Quarantine and Inspection Services, 80 Fed. Reg. 66,748 (Oct. 29, 2015) ("Final Rule") at 66,775 Tables 13 - Current and New AQI User Fee Rates.  The Final Rule made no meaningful effort to justify this dramatic increase in the commercial aircraft fee or to establish that a separate commercial aircraft fee was appropriate in the first place.  Nor did the Final Rule provide any analysis or any persuasive data to demonstrate that the new commercial aircraft fee was "commensurate" with current AQI program inspection costs for that user class as required by the FACT Act, despite repeated requests by industry stakeholders for such analysis and information.  In fact, APHIS has never convincingly supported previous commercial aircraft inspection fees.

4.      To explain the current fee, APHIS purports to invoke an Activity Based Costing ("ABC") methodology, which, according to APHIS, ensures that its AQI fees are strictly cost-based and do not cross-subsidize services across users.  But APHIS has refused to provide the fundamental data necessary to establish that the ABC methodology operates as APHIS claims.

Indeed, senior APHIS officials have admitted that AQI fees charged to air passengers were used

to cover costs of inspections of other users, in direct violation of the FACT Act's cross-

subsidization prohibition.  Final Transcript, USDA, *AQI Stakeholder Webinar*, at 27 (Jan. 13,

2015), *available at*

https://www.aphis.usda.gov/import_export/plants/plant_imports/aqi/downloads/transcript.pdf;

*see also* Regulatory Impact Analysis and Final Regulatory Flexibility Analysis, Final Rule,

APHIS-2013-0021 ("Final RIA"), at v (August 2015) (noting that costs of inspecting cruise ship

passengers "are currently funded by other AQI service recipients and/or through appropriated

funding").

     5.     The drastic and unsupported commercial aircraft fee amount, and APHIS's failure

to justify it consistent with the FACT Act's requirements, is not the only glaring deficiency with

the Final Rule.  The Final Rule violates the FACT Act in other ways.  For example, although the

FACT Act requires that fees charged to inspect "passengers as a class should include the cost of

related inspections of the aircraft," 21 U.S.C. § 136a(a)(2), the Final Rule imposes a separate

commercial aircraft inspection fee on top of the individual air passenger fee.  The Final Rule thus

violates the FACT Act, which prohibits the imposition of "double charge" fees on both air

passengers and commercial passenger aircraft.  The separate commercial aircraft inspection fee

also contradicts the recommendation of APHIS's own economic consultant, Grant Thornton

LLP, which explicitly noted that the proposed air passenger fee was already fixed at a rate

sufficient to cover inspections both of passengers and of the aircraft the passengers arrived on.

Grant Thornton, *Agricultural Quarantine and Inspection, Program AQI Fee Schedule*

*Assessment and Alternatives* 10 (May 21, 2012) ("The [proposed] air passenger fee will decrease

from $5.00 to $4.00.  As required by the AQI fee authority legislation, the revised air passenger

fee includes the cost of inspecting passenger aircraft."); *see also id.* ("The air passenger fee reflects the inclusion of costs related to inspecting passenger aircraft.").  Flatly ignoring Grant Thornton's explanation and the statutory prohibition on double charging, APHIS accepted Grant Thornton's proposed passenger fee, yet imposed an *additional* $225 fee on *all* commercial aircraft for each arriving flight, which will be charged "[e]ven if a plane carries no cargo."  Final Rule, 80 Fed. Reg. at 66,753 n.2.

6.     Additionally, the Final Rule attempts to justify the AQI fee levels, including those on commercial aircraft, in part based on APHIS's desire to maintain a "reserve" fund, "to ensure that funding is available in the event that there are" short-term fluctuations in inspection costs and fees.  80 Fed. Reg. at 66,748.  The Final Rule invokes the authority to maintain this "reasonable balance" under Pub. L. 101-624, Section 2509.  That provision, however, actually *revokes* the agency's "reserve" authority, conferring on APHIS the power to maintain this "reasonable balance" *only* "through fiscal year 2002."  21 U.S.C. § 136a(a)(1)(C).  The Final Rule nowhere acknowledges that APHIS's authority to maintain a reserve lapsed over a decade ago, despite this concern being raised in comments both in this and prior rulemakings.

7.     Finally, even apart from these clear statutory violations, the Final Rule contravenes the core requirements of the Administrative Procedure Act ("APA"), 5. U.S.C. § 500 *et seq.*, because the agency utterly failed to provide an adequate explanation for the amount of the commercial aircraft fee; the drastic three-fold increase in that fee; or why it chose to impose an additional fee on commercial passenger aircraft when it already charges each air passenger a separate fee that covers the full cost of inspecting the associated aircraft.  "Federal administrative agencies are required to engage in 'reasoned decisionmaking.'"  *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374

(1998)).  As A4A and other industry stakeholders pointed out in comments to the proposed rule,

both the Government Accountability Office ("GAO") and APHIS's own consultant concluded

the airline passenger fee by itself was enough to cover the costs of inspecting commercial

passenger aircraft.  *See* U.S. Gov't Accountability Off., GAO-13-268, *Agriculture Quarantine*

*Inspection Fees: Major Changes Needed to Align Fee Revenues with Program Costs* 10 (2013)

("For passenger fees, the costs of services include the costs of related inspections of the

vehicle.").  Yet in reversing the recommendation of its own consultant, whose methodology

APHIS claims to be relying on, APHIS provided no cost breakdown or reconciliation to justify

its about-face, nor did it address the FACT Act's mandate that "[t]he costs of the services with

respect to passengers as a class includes the costs of related inspections of the aircraft."  21

U.S.C. § 136a(a)(2).  Instead, the Final Rule asserts that the passenger fee and aircraft fee "cover

different costs," despite the conclusion of its economic consultant that the air passenger fee is

adequate to recover all the costs APHIS incurs in inspecting both passengers and aircraft.  80

Fed. Reg. at 66,753, 66,769.  "[S]o conclusory a statement cannot substitute for a reasoned

explanation, for it provides neither assurance that [APHIS] considered the relevant factors nor a

discernable path to which the court may defer."  *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d

227, 241 (D.C. Cir. 2008) (citations omitted).

   8. In light of the foregoing, the commercial aircraft fee provision of the Final Rule is

invalid because it violates the FACT Act, and because it is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The Court should

declare the commercial aircraft fee provision invalid and permanently enjoin APHIS from

collecting the fee under the Final Rule.

## II. PARTIES

9.      Plaintiff Airlines for America is the principal trade association representing scheduled airlines.[1]  A4A's purposes include working with its members in legal, political, and regulatory arenas to foster a business and regulatory environment that promotes a safe, secure, and financially stable U.S. airline industry.  A4A's members and affiliated airlines account for more than 70% of the annual passenger and air cargo traffic on U.S. airlines, and more than 450,000 full-time equivalent airline-industry jobs.  A4A is headquartered at 1275 Pennsylvania Ave. NW, Washington, DC 20004.

10.     Plaintiff International Air Transport Association ("IATA") is the world's largest international airline association, representing 263 airlines based in 117 countries, and conducting more than 80 percent of global air transportation.  At present, 95 IATA member airlines conduct commercial flights to, from, and/or within the United States.  IATA maintains offices in the United States, including in Washington, D.C. and Miami, Florida.

11.     Defendant United States Department of Agriculture ("USDA") is a federal agency that oversees food, agriculture, natural resources, rural development, and nutrition programs and policies.  APHIS is a sub-division of the U.S. Department of Agriculture.  Moreover, the FACT Act's substantive provisions are directed to the Secretary of the Department of Agriculture.  *See generally* 21 U.S.C. § 136a.

12.     Defendant APHIS is a federal agency tasked with detecting agricultural pests or diseases that may enter the United States.  APHIS administers the Agricultural Quarantine Inspection ("AQI") program for which the Final Rule created a new fee structure.  The AQI fees

---

[1] A4A's members are: Alaska Airlines, Inc.; American Airlines, Inc.; Atlas Air. Inc.; Federal Express Corporation; Hawaiian Airlines; JetBlue Airways Corp.; Southwest Airlines Co.; United Airlines, Inc.; and United Parcel Service Co.

APHIS adopted in the Final Rule are the subject of this Complaint.  APHIS is a sub-division of the U.S. Department of Agriculture.

13.     Defendant Department of Homeland Security ("DHS") is a federal agency tasked with protecting the United States from threats including terrorism and cybersecurity.  DHS oversees Customs and Border Protection's role in the AQI program.

14.     Defendant U.S. Customs and Border Protection ("CBP") is a federal agency charged with "protecting the public from dangerous people and materials while enhancing the Nation's global economic competitiveness."  Customs and Border Protection, *About*, www.cbp.gov/about.  CBP "collaborates with APHIS in providing the AQI services" at issue in this Complaint, and the AQI fees cover certain CBP expenses.  Final Rule, 80 Fed. Reg. at 66,749.  Moreover, though APHIS is the agency tasked with setting AQI fees at a rate commensurate with inspection costs, CBP incurs the majority of those inspection costs and the two organizations share the fees collected from users.

15.     Defendant Tom Vilsack is the Secretary of Agriculture.  In that official role, he oversees APHIS's implementation of the AQI program governed by the Final Rule.  He is named in the FACT Act as the official who may prescribe and collect quarantine and inspection fees. *See generally* 21 U.S.C. § 136a.

16.     Defendant Kevin Shea is the Administrator of APHIS.  In that official role, he oversees the implementation of the AQI program governed by the Final Rule.

17.     Jeh Charles Johnson is the Secretary of Homeland Security.  In that official role, he oversees CBP's participation in the AQI program.

18.     R. Gil Kerlikowske is the Commissioner of CBP.  In that official role, he oversees the implementation of the AQI program governed by the Final Rule.

### III. JURISDICTION AND VENUE

19.     This case arises under the Food, Agriculture, Conservation and Trade Act ("FACT Act") of 1990, 21 U.S.C. § 136a, and the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.*

20.     This Court has jurisdiction under 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 500 *et seq.*, and 28 U.S.C. § 2202 (Declaratory Judgment Act).

21.     Plaintiffs have standing as organizations to bring the claims for injunctive and declaratory relief.  "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552-53 (1996).  Plaintiffs' members pay the AQI commercial aircraft fee the Final Rule imposes, and thus these members would have standing in their own right to challenge the Rule.  Plaintiffs are organizations that exist to promote their members' business and commercial interests, which are subject to ongoing harm caused by the Final Rule.  And the relief Plaintiffs seek—a judgment declaring the Final Rule's commercial aircraft fee invalid and contrary to law and enjoining APHIS from assessing the fee—does not require an individualized determination necessitating the participation of Plaintiffs' members.  *See Schweiker v. Gray Panthers*, 453 U.S. 34, 40 n.8 (1981) ("The District Court correctly found that respondent had standing to sue because respondent alleged and proved that some of its members are persons adversely affected by the Secretary's regulations," which the suit sought to enjoin.).

22.     Venue is proper in the U.S. District Court for the District of Columbia, because Airlines for America, IATA, CBP, DHS, and APHIS's parent agency, the U.S. Department of Agriculture, reside in the District of Columbia, and a substantial part of the events or omissions giving rise to the claim occurred there.  28 U.S.C. § 1391(e)(1); *see also Dehaemers v. Wynne*, 522 F. Supp. 2d 240, 248 (D.D.C. 2007); *Hunter v. Johanns*, 517 F. Supp. 2d 340, 344 (D.D.C. 2007).

23.     APHIS's Final Rule, published October 29, 2015, and which took effect December 28, 2015, constitutes "final agency action" within the meaning of 5 U.S.C. § 704.

24.     Various A4A and IATA members exhausted their arguments before APHIS and CBP prior to the Final Rule issuing.  A4A submitted detailed comments on the Proposed Rule in a June 2014 letter and sent a follow-up letter in October 2015.  IATA endorsed A4A's arguments and emphasized the lack of justification for the fee increase and charges in addition to the air passenger fee.  Individual A4A members raised similar concerns, including United Airlines and American Airlines.  The arguments raised in this Complaint were raised during the rulemaking process.

## IV. FACTUAL BACKGROUND

### A.     The FACT Act

25.     APHIS is the federal agency tasked with "ensuring the free flow of agricultural trade by keeping U.S. agricultural industries free from pests and diseases."  Import Export, U.S. Dep't of Agriculture – Animal and Plant Health Inspection Service (Oct. 20, 2015), at https://www.aphis.usda.gov/aphis/ourfocus/importexport.  This responsibility includes inspecting international air, rail, truck, and maritime shipments (and their passengers) for foreign animal and plant materials, pests, and diseases.  *Id.*

26.     In 1990, Congress enacted the FACT Act, which authorizes APHIS to collect user fees that cover the costs of inspecting passengers, cargo, and vessels that arrive in the United States.  21 U.S.C. § 136a.  The FACT Act permits fees to cover inspections of "an international passenger, commercial vessel, commercial aircraft, commercial truck, or railroad car."  *Id.* § 136a(a)(1)(A).

27.     The FACT Act requires that fees charged for inspection services be "commensurate with the costs . . . with respect to the class of persons or entities paying the fees." 21 U.S.C. § 136a(a)(2).  As the Final Rule itself observes, the purpose of this provision is to "avoid cross-subsidization of AQI services."  80 Fed. Reg. at 66,748; *see also* Grant Thornton, *AQI Fee Schedule Assessment and Alternatives*, at 2 (May 21, 2012).  Put simply, AQI fees charged to one type of user cannot be used to cover any amount of the costs incurred for inspections of another type of user or for any services or purposes other than AQI.

28.     The FACT Act also prohibits double charging passengers and passenger aircraft, by requiring that "[t]he cost of the services with respect to passengers as a class  includes the cost of related inspections of the aircraft or other vehicles."  21 U.S.C. § 136a(a)(2).  As the Final Rule itself concludes, "[t]he cost of AQI services with respect to passengers as a class should include the cost of related inspections of the aircraft or other conveyance."  80 Fed. Reg. at 66,748.

**B.     APHIS's Prior AQI Fee Rulemakings**

29.     The Final Rule is the most recent instance of APHIS's decades-long practice— repeatedly decried by the GAO and industry stakeholders alike—of setting AQI fees with little or no empirical justification and in violation of the FACT Act.  *See, e.g.*, U.S. Gov't Accountability Off., GAO-06-644, *Homeland Security: Management and Coordination Problems Increase the*

*Vulnerability of U.S. Agriculture to Foreign Pests and Disease* 33 (2006) ("APHIS does not know whether inspections of international airline passengers and commercial aircraft, vessels, trucks, and railroad cars are being funded by revenue from the appropriate user fee."); Air Transport Association, Comment Letter on Proposed Rule on Agricultural Inspection and AQI User Fees Along the U.S./Canada Border, Dkt. No. APHIS-2006-0096 (Nov. 21, 2006) ("The interim rule contains no detail as to how the direct costs of performing the inspections are determined.  In fact, there is evidence APHIS may not even know what those costs are.").

30.     Since the FACT Act's passage, APHIS has periodically promulgated rules changing the fees charged to each class of user.  But APHIS has never provided what the FACT Act requires: data substantiating that "the amount of the fees is commensurate with the costs of [AQI] services with respect to the class of persons or entities paying the fees."  21 U.S.C. § 136a(a)(2).  Nor has the agency satisfied the APA, because the data it has provided in every rule—including the Final Rule at issue here—have been woefully insufficient to justify the fees and so lacking in detail as to deprive stakeholders of a meaningful opportunity to offer analysis or comment.

31.     In 1992, APHIS reduced the fees charged for each arriving international air passenger, but provided no data in that rulemaking justifying the fee change or amounts.  *See User Fees—Agricultural Quarantine and Inspection Services*, 57 Fed. Reg. 62,469-71 (Dec. 31, 1992).  And a 1999 regulation set fees on an increasing schedule for future years without explaining how the escalating fees were connected to inspection costs.  The agency merely cited its desire to increase its "reserve."  *See User Fees; Agricultural Quarantine and Inspection Services,* 64 Fed. Reg. 62,089, 62,090 (Nov. 16, 1999).

32.     But APHIS's statutory authority to maintain a "reserve" lapsed over a decade ago. In 1996, Congress amended the FACT Act to allow APHIS to maintain a "reasonable balance" in its AQI fee account "*through fiscal year 2002*."  *See* Pub. L. 101-624, Section 2509 (1996) (emphasis added); *see also* 21 U.S.C. § 136a(a)(1)(C).  Congress amended the FACT Act again in 2002, but did not extend the agency's authority to maintain a "reserve" beyond 2002.  *See generally* Pub. L. 107-171, title X, § 10418(b)(5), 116 Stat. 509 (2002).  Thus, the law as it is currently written revoked APHIS's authority to maintain a reserve at the end of 2002.  APHIS nevertheless has continued to collect "reserve" funds and cites its interest in a reserve as a factor in setting AQI fees and a justification for fee levels in excess of costs of services.  *See* Final Rule, 80 Fed. Reg. at 66,753 ("To fund the reserve, these base [AQI] fees are increased by 3.5 percent."); *see also* RIA at 6 ("Net revenue of $27.9 million in FY 2016 and $53.9 million in FY 2017 is expected to be available to maintain the AQI reserve fund.").

33.     APHIS continued its pattern of charging unexplained AQI fees in December 2004, when it increased fees without providing any substantiating data, after providing stakeholders only three weeks for comment.  *User Fees for Agricultural Quarantine and Inspection Services*, 69 Fed. Reg. 71,660 (Dec. 9, 2004) (codified at 7 C.F.R. § 354).  After this truncated rulemaking, APHIS received many comments from air carriers and other industry parties regarding its improper procedure.  As one commenter put it, "There is no compelling reason why the Department of Agriculture could not have engaged in a public, deliberative process before imposing an increase in the AQI fees on airlines and passengers . . . ."  Airports Council Int'l, Comment Letter on Proposed Rule Regarding User Fees for Agricultural Quarantine and Inspection Services (Feb. 7, 2005).

34.     In 2006, the GAO observed that because of APHIS's and CBP's years-long

pattern of lackadaisical or even non-existent accounting, the AQI fee schedules likely ran afoul

of the FACT Act, particularly its prohibition on cross-subsidization.  U.S. Gov't Accountability

Off., GAO-06-644, *Homeland Security: Management and Coordination Problems Increase the*

*Vulnerability of U.S. Agriculture to Foreign Pests and Disease* 33 (2006) ("[A] senior APHIS

budget official told us that [AQI] cost information [provided by CBP] was not helpful to APHIS

for reviewing the user-fee type rates because they needed the breakdown of actual costs by user-

fee type and because APHIS could not determine if the costs were accurate.").  According to the

GAO, "APHIS does not know whether inspections of international airline passengers and

commercial aircraft, vessels, trucks, and railroad cars are being funded by revenue from the

appropriate user fee." *Id.* at 33.

35.     APHIS did not improve its practices in response to this criticism.  Mere months

after the GAO report, APHIS issued an interim rule designed to increase its revenue by

eliminating a then-existing AQI exemption for flights and air passengers arriving from Canada.

*See Agricultural Inspection and AQI User Fees Along the U.S./Canada Border*, Interim Rule, 71

Fed. Reg. 50,324 (Aug. 25, 2006).  APHIS did not respond substantively to numerous industry

comments and objections, but instead removed the exemption in 2007 for flights arriving from

Canada.  *Agricultural Inspection and AQI User Fees Along the U.S./Canada Border*, 71 Fed.

Reg. 67,436 (Nov. 22, 2006).  More troubling, the cost data APHIS cited in its 2006 interim

rulemaking—which suggested that the annual cost of an airport-based AQI inspector was

$708,000, or approximately 5 times that of a land-based inspector, *see Preliminary Economic*

*Analysis for Significant Rulemaking and Initial Regulatory Flexibility Analysis*, Dkt. No. 2006-

096-1 (Aug. 10, 2006)—appears to drastically exaggerate the actual cost of these inspectors

based both on public salary data and information made public in the final regulatory analysis to the Final Rule.  *See* Final RIA at 15-17.

36.      These oversights and omissions did not go unnoticed by the AQI program's overseers.  In 2007, the Department of Homeland Security Office of the Inspector General found significant inaccuracies in the data used to track agricultural inspection activities.  Dep't of Homeland Security, Off. of Inspector General, *Review of Customs and Border Protection's Agricultural Inspection Activities* 1 (Feb. 21, 2007).  That same year, the GAO recommended in a report on air passenger inspection fees that APHIS "make information on the estimated cost of inspections as well as the basis for these cost estimates readily available to affected parties to improve transparency and credibility."  U.S. Gov't Accountability Off., GAO-07-1131, *Federal User Fees: Key Aspects of International Air Passenger Inspection Fees Should Be Addressed Regardless of Whether Fees are Consolidated* 36 (2007).  And in 2008, the GAO reiterated its complaints in a report tellingly entitled "Substantive Reviews Needed to Align Port-Related Fees with the Programs They Support," GAO-08-321 (2008).  The report's recommendation to the Secretary of Agriculture could not have been clearer: "Improve the transparency of the regulatory process of setting AQI fee rates by providing clearer information about how the rates for each of the fee types (vessel, air passenger aircraft, etc.) are determined."  *Id.* at 39.

37.      Yet even this pointed recommendation went unheeded.  The following year, APHIS issued a new interim rule on an "emergency" basis proposing to increase AQI user fees for passengers and aircraft ten percent across the board, without providing data to support this proposed fee increase.  *See generally User Fees for Agricultural Quarantine and Inspection Services*, Interim Rule, 74 Fed. Reg. 49,311 (Sept. 28, 2009).  The agency chose an interim rule procedure—which effectively bypassed a meaningful opportunity for notice and comment—

despite the fact that the GAO had criticized it for this very practice. *See* U.S. Gov't

Accountability Off., GAO-07-1131, *Federal User Fees: Key Aspects of International Air*

*Passenger Inspection Fees Should Be Addressed Regardless of Whether Fees are Consolidated*

36 (2007) ("APHIS's use of the 'good cause' exemptions to issue interim final rules limits

stakeholder input. . . . When agencies do not effectively communicate their analysis and results,

they miss the opportunity to obtain meaningful comments that could affect the outcome of their

regulatory changes.").  In the wake of comments and complaints from the industry regarding the

lack of transparency and hard data, APHIS eventually "withdrew that interim rule before it

became effective in order to explore other regulatory alternatives." *User Fees for Agricultural*

*Quarantine and Inspection Services*, Proposed Rule, 79 Fed. Reg. 22,895, 22,896 (Apr. 25,

2014).

38.     In 2012, the GAO undertook a more thorough critique of APHIS's and CBP's

AQI accounting.  The 2012 GAO report reiterated that "data quality is an ongoing issue within

the AQI data systems, including the Work Accomplishment Data System (WADS)—the primary

repository for arrival, inspection, and interception data."  U.S. Gov't Accountability Off., GAO-

12-885, *Homeland Security: Agriculture Inspection Program Has Made Some Improvements,*

*But Management Challenges Persist* 20 (2012).  According to the GAO, data collection was

afflicted by "transcription errors" affecting data reliability at nearly half of the ports reviewed,

which led to "data that were over reported or had not been recorded." *Id.*  The process did not

accurately measure the costs of inspection; at best, it detected "only unusually large changes at a

port." *Id.*  The data accordingly "is not a representation of the total number of agricultural

inspections carried out at ports and **cannot be used** to analyze the number of agricultural

inspections conducted." *Id.* at 21 (emphasis added).  "Without reliable data on work activities,"

the GAO continued, "AQI program officials cannot be assured that they have the information they need to manage the program." *Id.* at 22. The GAO's ultimate conclusions were harsh: It found that "potential weaknesses exist at several places in the data collection process," *id.* at 40, and that these flaws "have the potential to affect . . . **the effort to analyze the structure and amounts of the AQI user fees**," *id.* at 22 (emphasis added). The Department of Agriculture's own Inspector General found the total WADS data error rate to be approximately 63 percent, with one port reviewed reaching an error rate of 96 percent. Joint Report, Dep't of Homeland Security & Dep't of Agriculture, Off. of Inspectors General, *Review of Customs and Border Protection's Agriculture Inspection Activities* 45 (App. F) (2007). Yet the 2015 Final Rule explicitly relied on WADS data, with no discussion of these longstanding and pervasive problems. *See* Final Rule, 80 Fed. Reg. at 66,762.

39. In 2013, the GAO issued its third report focused solely on problems with APHIS's fee-setting. The GAO again emphasized that "data quality is an ongoing issue with the AQI data systems, including the Work Accomplishment Data System (WADS)." U.S. Gov't Accountability Off., GAO-13-268, *Agricultural Quarantine Inspection Fees: Major Changes Needed to Align Fee Revenues with Program Costs* 8 (2013). The GAO noted that APHIS's own consultant (Grant Thornton, who APHIS has engaged to assist with the fee calculations and recommendations since 2010) had "inquired about potential data quality issues," but that its analysis ultimately "assumed the accuracy of the data provided from both APHIS and CBP." *Id.* at 8 & n.14.

## C.  APHIS Proposes Its Most Dramatic Aircraft Fee Increase Ever

40. In April 2014, APHIS issued a Proposed Rule that greatly increased the fees charged to commercial airlines and some other users, while reducing fees for some users. *User*

*Fees for Agricultural Quarantine and Inspection Services*, 79 Fed. Reg. 22,895 (Apr. 25, 2014). In total, APHIS estimated that its proposed rule would increase annual fee collections by $94.5 million. *Id.* at 22,904.

41.     Major increases included: a 218 percent increase for commercial aircraft, a 71 percent increase for maritime cargo vessels, a 74 percent increase for commercial rail cargo, and a brand new fee for cruise passengers. 7*Id*. at 22,901-02.  The proposed rule also added a $375 fee for cargo "treatment."  *Id.* at 22,900-03.  At the same time, APHIS issued a concurrent proposed rule announcing an increase in the fees for AQI overtime services.  *See Fee Increases for Overtime Services*, 79 Fed. Reg. 22,887 (Apr. 25, 2014).

42.     The Proposed Rule set forth APHIS's desire to more than triple the fee for inspecting "commercial aircraft" from $70.75 to $225.  79 Fed. Reg. at 22,901.  APHIS's consultant, Grant Thornton—whose cost accounting methodology APHIS relied upon in issuing the Proposed Rule, *see id.* at 22,898—was the source of this $225 number.  But the Grant Thornton report expressly concluded that the $225 fee on commercial aircraft should be applied solely to "cargo only" aircraft, because the "cost of inspecting passenger aircraft is included in the air passenger fee."  Grant Thornton, *Agricultural Quarantine and Inspection, Program AQI Fee Schedule Assessment and Alternatives* 10 (May 21, 2012).  Notwithstanding the consultant's conclusion, and without explaining why the agency relied on its analysis to arrive at the $225 fee but then ignored its conclusions regarding to whom the fee should apply, the Proposed Rule imposed the $225 aircraft inspection fee on all commercial aircraft, *both* cargo-only aircraft and commercial (non-private) passenger aircraft, regardless of aircraft type (*i.e.*, size) and regardless of whether the aircraft is carrying cargo to inspect. 79 Fed. Reg. at 22,901.

43.     While APHIS proposed to increase the fees for commercial aircraft, it recognized

that airline passengers had been overcharged for years—APHIS had collected hundreds of

millions of dollars in fees above the cost of services provided to air passengers in 2010 and 2011

alone.  *See* GAO-13-268, at 10 tbl. 1 (noting passenger-fee surplus of over $145 million for

Fiscal Year 2011); Grant Thornton, *Agricultural Quarantine and Inspection Program: AQI Cost

Briefing* 10 (May 1, 2013) (more than $134 million in Fiscal Year 2010).  Accordingly, APHIS

proposed lowering the passenger fee from $5 to $4 because the "current fee was going to

generate revenues in excess of what will be required to support anticipated costs."  79 Fed. Reg.

at 22,901.

44.     But APHIS did not disclose how it spent or otherwise disposed of the excess

passenger fee revenue collected in the past, or whether they were stored in a reserve fund

dedicated to air passengers (or aircraft).  Nor did APHIS credit the excess fees to air passengers

or commercial passenger aircraft operators.  Indeed, if APHIS had credited excess funds

collected from air passengers to commercial aircraft inspections, there would be hundreds of

millions of dollars in the reserve account to pay for aircraft inspections.  *Cf.* GAO-13-268, at 10

tbl. 1; Grant Thornton, *Agricultural Quarantine and Inspection Program: AQI Cost Briefing* 10

(May 1, 2013).

45.     Even if this money did go into APHIS's (unlawful) "reserve" account, it is

impossible to determine whether these hundreds of millions of dollars were spent consistent with

the FACT Act's prohibition on cross-subsidization.  In fact, APHIS has made contradictory

statements over time with respect to whether it treats the reserve as an all-purpose fund, or

whether it separates reserve funds by user class as the FACT Act requires.  For instance, in its

2006 rulemaking, APHIS claimed, "Internal recordkeeping ensures that revenues received from

air passengers and each mode of transportation are properly recorded and utilized.  While AQI

revenues all go into one AQI account, they are applied to specific activities. . . . Any excess

collections will be used to rebuild the AQI reserve balances *for the various service categories*."

*Agricultural Inspection and AQI User Fees Along the U.S./Canada Border*, 71 Fed. Reg. 50,320,

50,324 (Aug. 25, 2006) (emphasis added).  Yet in the lead-up to last year's Final Rule, APHIS

Administrator Kevin Shea stated at a stakeholder meeting, "The fees are set by mode, but the

overall [reserve] account is not.  So there is not a separate reserve account for passengers versus

railcars. . . . All revenue is aggregated."  Final Transcript, AQI Stakeholder Webinar, at 27 (Jan.

13, 2015), *available at*

https://www.aphis.usda.gov/import_export/plants/plant_imports/aqi/downloads/transcript.pdf.

And the Final Rule itself states that, prior to Grant Thornton's application of the ABC

methodology, APHIS *could not* segregate reserve funds by user class—it did not have the data

necessary to do so.  Final Rule, 80 Fed. Reg. at 66,762.

46.     The most proper use of this enormous sum of excess collections from air

passengers would have been to put it towards what the FACT Act requires passenger fees (in

part) should cover: "the costs of related inspections of the aircraft."  21 U.S.C. § 136a(a)(2).  But

ignoring its utter lack of accounting for these hundreds of millions of dollars, APHIS decided

instead in the Proposed Rule to increase its already unlawful double charge on commercial

aircraft.  The Proposed Rule more than tripled the separate fee charged to commercial aircraft

(both passenger and all-cargo) on top of the passenger fee, despite its lack of statutory authority

and despite the fact that no other mode of transportation had ever been charged a separate

passenger and vessel fee.

47.     Notably, a new fee for cruise passengers was instituted to cover both "inspection of passenger baggage" and "inspection of the vessel itself," including "inspecting the ship's stores to ensure prohibited items are not present or are properly safeguarded." Proposed Rule, 79 Fed. Reg. at 22,902. The cruise ship operator is not charged a separate vessel fee: "[T]he costs of inspecting the cruise ships themselves would be covered by the proposed sea passenger fee rather than a separate fee similar to the commercial maritime cargo vessel fee, just as the international air passenger user fee covers the costs associated with inspecting the aircraft on which they arrived." *Id.* APHIS did not justify its failure to apply the same principle in the aircraft context. Even though it expressly recognized the statute's command that passenger fees cover the cost of related inspections of the aircraft, see 79 Fed. Reg. at 22,896, APHIS nevertheless imposed an aircraft fee on commercial aircraft carrying passengers.

48.     Moreover, APHIS decided to forgo fees entirely for a variety of users receiving inspection services, including bus passengers and private aircraft, denying itself $244 million in revenue. 79 Fed. Reg. at 22,903. APHIS covered that shortfall in part by fees collected from other user types, in direct violation of the FACT Act. *See* Final RIA at 27 ("AQI services received by classes that do not pay user fees are covered through appropriated funding *or a portion of user fees otherwise collected.*" (emphasis added)). That is, the Final Rule's own Regulatory Impact Statement expressly admits APHIS has engaged in prohibited cross-subsidization, and the Final Rule shows the agency's intent to continue this unlawful practice.

49.     The fees calculated in the Proposed Rule relied on workload data that was widely criticized and fraught with errors. *Id.* As explained above, for years before the NPRM was issued, various government agencies and APHIS's own consultant had criticized APHIS and CBP data collection practices and noted that the data were unreliable. Yet in the NPRM, APHIS

made no attempt to explain how it worked around these limitations or respond to these critiques; indeed, it did not even mention them.  The closest APHIS came to justifying the Proposed Rule's asserted costs was in the Final Regulatory Impact Statement, in which it laid out, in Tables 5-10, APHIS's and CBP's purported costs by user-type.  *See* RIA at 16-23.  But these data, already recognized as unreliable, were woefully inadequate: not only are they highly aggregated, but the data are unaccompanied by any explanation of how costs break down within a user class.

50.     Nor was there any explanation for the hugely different per employee costs the data suggest.  For example, APHIS asserts that, in Fiscal Year 2010, its costs per full-time equivalent (FTE) rail inspector were more than $500,000.  *Id.* at 22.  But for the same year, costs were less than $100,000 per air passenger FTE, and about $190,000 per commercial aircraft FTE.  *Id.*  The CBP data were even sparser: All that was provided in the RIA was a summed cost for each user class, in the hundreds of millions of dollars, with no explanation or effort to tie these costs to inspector activities.  *Id.*  Tying those data to the FTEs listed in the Final Rule reveals the same unexplained pattern: on a per-FTE basis, CBP's total costs of inspections in the "Commercial Aircraft" category far exceed its claimed costs on the same basis for any other user.  *See* 80 Fed. Reg. at 66763 tbl. 12.  For example, for 2010 CBP's total costs per FTE for commercial aircraft were over $370,000, while no other category of user exceeded $189,000 on the same basis. (Final Rule Table 12, RIA Table 6).  APHIS offers no analysis or explanation permitting stakeholders to assess or even comprehend why such discrepancies exist across users.

51.     Moreover, APHIS proposed additional fees beyond its asserted costs of services to "generate revenue to replenish the AQI account reserve."  79 Fed. Reg. at 22,900.  As APHIS had over-collected from commercial air by at least hundreds of millions of dollars, the need for reserves for those inspections is highly suspect.  The agency also claimed it was rounding each

fee to the nearest $1 or $25 increment depending on the applicable fee, justifying the rounding based on the "flexibility" allowed for by the reserve. *Id.* But, as noted above, APHIS's statutory authority to maintain a reserve lapsed in 2002. *See* 21 U.S.C. § 136a(1)(C).

**D.    The Industry Comments on APHIS's Proposed Tripling of the Commercial Aircraft AQI Fee**

52.    APHIS received over 200 comments from surprised and confused stakeholders questioning the fee hikes outlined in the Proposed Rule. Many affected industries raised questions, from airlines to cruise lines to flower importers. Comments noted that the sharp fee increases would be difficult for many industries to handle and requested additional data so the fees could be understood.

53.    Plaintiff A4A submitted comments, endorsed by IATA, on the Proposed Rule on June 24, 2014. A4A informed APHIS that the duplicative fees were unauthorized, that the proposed commercial aircraft fee was excessive and unsupported by APHIS's purported analysis, that the proposed fee structure cross-subsidizes certain industries and AQI-service users, that it double-charges passengers and carriers for the same services, that APHIS failed to provide the data it used in its fee calculations to interested parties and that its analysis and explanation was inadequate. *See* Comments of Airlines for America, *User Fees Agricultural Quarantine and Inspection Services*, Dkt. No. APHIS-2013-0021 (June 24, 2014).

54.    A4A and other commentators requested data to understand APHIS's Proposed Rule, but no additional data was provided until the rule was made final, and even those data, like the little information provided in the Proposed Rule, were so aggregated and inconsistent as to be almost useless. Specifically, A4A requested several types of data in its June 24, 2014 comment letter, including: the data showing what actually drove the inspection costs that underpin the ABC methodology; data on the costs of inspecting each area of an aircraft, including passenger

baggage and the cargo hold; and APHIS's data on the number of AQI inspections and arriving flights.

55.     Other stakeholders submitted similar comments, including:

a.      Comments co-signed by two dozen industry groups. including the American Trucking Association and Cruise Lines International Association, noting that "the agency has not yet conducted a sufficiently rigorous and transparent process to determine whether ABC is the most appropriate costing methodology and has not provided detailed cost information to give stakeholders a meaningful opportunity to comment." Comment Letter from Various Industry Stakeholders, *User Fees for Agricultural Quarantine Inspection Services*, Dkt. No. APHIS-2013-0021, at 2 (July 25, 2014).  The industry groups also wrote that even though they had "requested additional information to allow us to better analyze the AQI rulemaking . . . APHIS has not yet made this additional data available."  *Id.* at 3.

b.      China Airlines commented that "the proposed rule does not provide any reasoned justification for this huge three-fold increase in the 'commercial aircraft' inspection fees" and echoed Plaintiff's sentiment that "conclusory assertions such as [APHIS's statement that the increase is needed to 'more accurately align the fee with the actual cost' of inspection] are not enough to justify such a massive fee increase."  China Airlines, Comments Letter on Proposed Rule, at 2 (June 24, 2014).

c. Several major U.S. airlines commented that the "public's ability to fully engage in notice and comment in this matter is constrained by the dated, highly aggregated and incomplete information APHIS has thus far provided in the docket."  United Airlines, American Airlines, and Delta Air Lines, Comment on Proposed Rule, at 8 (July 24, 2014).

d. A4A also submitted a letter to the Secretary of Agriculture observing that "air passenger flights are the only type of AQI user for which APHIS proposes a fee both on the passenger and on the mode," resulting in "double taxation" that is "unjustified."  Letter from Airlines for America to Sec. Thomas J. Vilsack, at 2 (Oct. 15, 2015).

**E.     APHIS Promulgates The Final Rule, Ignoring Key Deficiencies Raised in Comment Letters**

56.     APHIS's Final Rule and its regulatory analysis provided only a sliver of the information stakeholders requested and made negligible changes to the proposed fees.  APHIS *described* its inspection activities at length, but provided few *numbers* to substantiate and quantify costs or demonstrate how they were assigned.  APHIS's fees are charged in dollars and cents—stakeholders need numbers to understand how APHIS and CBP costs translate into AQI fees.  The Final Regulatory Impact Analysis, for example, asserts for commercial aircraft CBP total costs of $103,225,589 for FY 2012, breaking down only "imputed" and "support" costs, but with no further detail.  Final RIA at 17 tbl. 6.

57.     APHIS did not address the many concerns raised by commenters about its lack of data, and it added nothing to the docket after the comments period closed other than the Regulatory Flexibility Analysis required by the APA—filed only when the rule was made final, despite the fact that its data dated from 2010 to 2012.  *See* 5 U.S.C. § 603.

58.     In the Final Rule APHIS responded with vague and unsupported assurances that "[u]ser fees charged to one class of users will not be used to subsidize inspections of another class of users," and that "cost accounting principles ensure[] that costs are aligned with activities that generate those costs and that costs can only be counted once." 80 Fed. Reg. at 66,752. Repeatedly, the Final Rule pointed to the Activity Based Costing method as unimpeachable, confidently asserting that "[t]he use of activity based costing (ABC) methodology in establishing fees ensures that no cost is double counted." *Id.* at 66,748.  But without some showing that its ABC method *actually works* or that the agency used reliable data to properly construct an ABC model, these assurances provide cold comfort.

59.     The Final Rule took effect on December 28, 2015, and is codified at 7 C.F.R. § 354.  Airlines for America's constituent airlines and dozens of IATA members have been paying these increased fees since they took effect.

**F.     The Final Rule Violates the FACT ACT**

*i.      The Final Rule Imposes a Duplicative Commercial Aircraft Fee In Violation Of The FACT Act*

60.     The Final Rule violates federal law by charging both a fee to air passengers and a duplicative fee to commercial air carriers for inspections of the same aircraft.  As APHIS itself acknowledged in the Final Rule, the FACT Act requires that "[t]he cost of the services with respect to passengers as a class includes the cost of related inspections of the aircraft or other vehicle."  21 U.S.C. § 136a(a)(2).  APHIS acknowledged the same requirement in the Proposed Rule: "Consistent with our AQI fee authority, the costs of inspecting the cruise ships themselves would be covered by the proposed sea passenger fee rather than a separate fee similar to the commercial maritime cargo vessel fee, **just as the international air passenger user fee covers the costs associated with inspecting the aircraft on which they arrived**."  79 Fed. Reg. 22,902

(emphasis added).  The Final Rule, however, charges a $225 commercial aircraft fee in addition to the $4 per passenger fee for every passenger flight, regardless of whether the flight actually carries cargo.  *See* Final Rule, 80 Fed. Reg. 66,753 n.2; *id.* at 66,755-57.

61.    Despite the statutory requirement that the passenger fee cover aircraft inspection costs, APHIS allegedly "determined that the air passenger fee is not adequate to recover all the costs we incur in inspecting both passengers and aircraft." *Id*. at 66,769.  In the Final Rule, APHIS claimed that the air passenger fee and the commercial aircraft fee "cover different costs." *Id.*  As relates to the aircraft itself, the passenger fee, APHIS contended, covers the cost of "inspecting the interior of the passenger aircraft," whereas the commercial aircraft fee covers "inspecting the aircraft hold or exterior for contaminants, pests, or invasive species."  *Id.*  But APHIS's own consultant, Grant Thornton, made no such distinction in its fee recommendations. Grant Thornton recommended reducing the air passenger fee from $5.00 to $4.00, noting the reduced $4.00 fee would "include[] the costs of inspecting passenger aircraft," not merely some parts or certain areas of such aircraft.  APHIS provided no explanation for rejecting its own consultant's approach.

62.    The FACT Act itself does not allow for such fine parsing: It simply provides that the "costs of the services with respect to passengers as a class includes the costs of related inspections of the aircraft."  21 U.S.C. § 136a(a)(2).  APHIS did not draw this arbitrary distinction for any other mode of transportation.[2]

63.    Nor did the agency acknowledge that over forty percent of passenger flights subject to AQI carry *no commercial cargo at all*.  In response to comments that pointed this out,

---

[2] As required by the FACT Act, APHIS's new cruise passenger fee covers the costs of "inspection of passenger baggage" *and* "inspection of the vessel itself," including "inspecting the ship's stores to ensure prohibited items are not present or are properly safeguarded."  Proposed Rule, 79 Fed. Reg. at 22,902.

the Final Rule simply stated, "[I]t would be administratively burdensome to charge and audit a multitude of fees for the many different types of commercial aircraft and their cargo that enter the United States."  80 Fed. Reg. at 66,755.

64.     The double charging imposed by the Final Rule is not only unlawful, it is also unnecessary: APHIS has been advised repeatedly by commenters, government auditors, and its own consultant that the air passenger fees it charges *are* sufficient to cover the costs of inspecting both passengers and aircraft.

65.     As noted, Grant Thornton observed that the reduced $4.00 passenger fee (reduced further to $3.96 in the Final Rule) already includes the cost of inspecting passenger aircraft.  And for the same reason, Grant Thornton also found that the $225 commercial aircraft fee necessarily applies solely to "cargo only" flights, since passenger aircraft inspection costs are already "included in the air passenger fee."  Grant Thornton, *Agricultural Quarantine and Inspection, Program AQI Fee Schedule Assessment and Alternatives* 10 (May 21, 2012).

66.     The GAO's review of APHIS's cost and revenue calculations similarly recognized that only air passengers should pay the cost of inspecting the aircraft:  "For passenger fees, the costs of services include the costs of related inspections of the vehicle."  GAO-13-268, at 9.

67.     Despite these clear instructions from GAO and APHIS's own consultant, APHIS publicly stated that all commercial aircraft would be charged the same $225 fee, regardless of whether the aircraft carried passengers or instead carried only cargo.  In response to a question about whether APHIS would treat commercial aircraft as "one category" or "divid[e] commercial aircraft between passenger carrying aircraft and cargo carrying aircraft," APHIS said it would treat all aircraft as one category and that "[a]ll aircraft that are capable of carrying cargo will be

charged the aircraft fee."  Final Transcript, USDA, *AQI Stakeholder Webinar*, at 27 (Jan. 13, 2015), available at

https://www.aphis.usda.gov/import_export/plants/plant_imports/aqi/downloads/transcript.pdf.

As a result, every arriving flight with more than 64 passengers that is capable of carrying any cargo (essentially, every aircraft with a hold compartment, which includes all aircraft types generally used in international passenger air transportation, with limited exceptions) is charged a double fee: the $4 per passenger fee and the $225 aircraft fee.

       *ii.*     ***The Final Rule Cross-Subsidizes Across Users In Violation Of The Fact Act***

     68.     APHIS has not shown that fees collected from air passengers and commercial carriers are used solely to cover inspection costs for these users.  In fact, APHIS's own data and statements show that AQI air passenger fees cover APHIS' and CBP's costs of inspecting other user types.  The FACT Act forbids this cross-subsidization among user types and similarly prohibits charging for expenses outside of those outlined in the Act.

     69.     APHIS has not provided public cash flow information or reserve levels showing how revenue generated from carrier and passenger fees is spent.  For example, according to the GAO, in Fiscal Year 2011, APHIS collected $433,679,205 in fees to cover $277,838,102 in costs for commercial aircraft passengers—a surplus of over $145 million.  GAO-13-268 at 10 tbl.1.  In Fiscal Year 2010, APHIS overcharged air passengers by almost as much—$134,871,098.  Grant Thornton, *Agricultural Quarantine and Inspection Program: AQI Cost Briefing* 10 (May 1, 2013).  APHIS has not accounted for the excess fees collected in either year or any of the years before or after those dates.

     70.     Further, APHIS admitted to a FACT Act violation in a presentation to stakeholders on January 13, 2015.  In that presentation, Defendant Kevin Shea acknowledged

that APHIS "could not operate this program" if passenger fees were lowered from five dollars to four dollars immediately, even though the costs of inspecting the passengers and their aircraft could be covered by the lower fee.  Final Transcript, USDA, *AQI Stakeholder Webinar*, at 27 (Jan. 13, 2015), available at https://www.aphis.usda.gov/import_export/plants/plant_imports/aqi/downloads/transcript.pdf. Shea thus confirmed that the additional revenue being obtained from passenger fee overcharges was being used to cover program costs for other users.

71.     APHIS similarly admitted to a FACT Act violation in the Final Rule's Regulatory Impact Statement, when it said the costs of inspecting user classes that do not pay fees (such as bus passengers and private aircraft) "are covered through appropriated funding *or a portion of user fees otherwise collected*."  Final RIA at 27 (emphasis added).

### iii.     The ABC Model Relied Upon By APHIS Has Major Flaws

72.     APHIS has failed to establish that the ABC model employed by its consultant yields accurate, reliable fees, thus violating the APA's prohibition on arbitrary and capricious decision-making.  While activity based costing is an accepted method for assigning costs and deriving fees, it yields the correct fees only when the data used is reliable, when the costs are assigned properly to activities, and when "cost drivers"—the factors that "causally affect costs over a given time span"—are correctly identified.  Horngren, Datar, & Rajan, *Cost Accounting: A Managerial Emphasis*, 34 (15th ed. 2014).  APHIS has not demonstrated that any of these requirements are met.  Nor has it proven that its cost models account for expenses paid by appropriations and/or overtime charges.  If appropriations cover APHIS's and CBP's expenses for commercial aircraft inspections, the FACT Act's command that AQI fees be "commensurate"

with the "costs of inspection" would require that the fees be set at a level reduced to account for the costs defrayed by appropriations.

73.     APHIS has not demonstrated that the data it uses in its ABC model are reliable. The data APHIS relied on were highly aggregated—the only detail provided was the number of FTE employees dedicated to a particular user class, and the total costs.  CBP initially provided only its total costs (lump sums by fiscal year in the hundreds of millions of dollar); even its aggregate FTE data was never provided until a high-level estimate was included in the Final Rule.  *See* Final Rule, 80 Fed. Reg. at 66,763.  But even taking all of this information together, it is drastically insufficient to show that the ABC method has worked properly.  This is particularly true given APHIS' parsing of the aircraft into pieces to justify its double charging.  If, as APHIS asserts, inspecting one section of the aircraft is supposedly paid for by the passenger fee, while inspecting an adjacent part of the plane is covered by the commercial aircraft fee, the costs of these inspections must be broken down in the same manner.  But none of the data either APHIS or CBP provided during this rulemaking process supports—or even could support, at so high a level—this fine-toothed division.

74.     Nor does the Final Rule or any of the accompanying documents even mention the long-recognized flaws in APHIS's and CBP's data collection.  In 2007, the DHS Office of the Inspector General found significant inaccuracies in the data used to track agricultural inspection activities.  Dep't of Homeland Security, Off. of the Inspector General, *Review of Customs and Border Protection's Agricultural Inspection Activities* 1  (Feb. 21, 2007).  The GAO's 2012 report concluded that the AQI program's data flaws "have the potential to affect . . . **the effort to analyze the structure and amounts of the AQI user fees**."  U.S. Gov't Accountability Off., GAO-12-885, *Agriculture Inspection Program Has Made Some Improvements, But Management*

*Challenges Persists* 22 (2012).  The report reiterated that "data quality is an ongoing issue within the AQI data systems, including the Work Accomplishment Data System (WADS)—the primary repository for arrival, inspection, and interception data." *Id.* at 20.  Data collection was afflicted by "transcription errors," among other issues, which led to "data that were over reported or had not been recorded." *Id.*  Thus, not only was the data provided by APHIS in this rulemaking too high-level and aggregated to allow for meaningful review and comment—it was also fundamentally flawed, with no explanation given for how (or whether) the agency addressed these shortcomings.

75.    APHIS's costs are allocated to activities based on an "activity labor survey" used to estimate the level of "effort" devoted to AQI activities.  APHIS, however, has not released those "survey" and "effort" data in order for users to assess its reliability. The only data released (and that only at the time the rule was made final) provide highly-aggregated claims of the number of FTE APHIS and CBP employees committed to different types of (again, highly-aggregated) users.  Those data contain many unexplained anomalies, for example, that APHIS AQI costs on a per-FTE basis ranged by more than 500% among user classes in 2010.  Final RIA, tables 5-11 pages 16-25, comparing rail inspectors and passenger inspectors.

76.    APHIS's fee-setting model relies on forecasted data, but neither APHIS nor Grant Thornton acknowledged the potential problems with this approach.  Using forecasted data to set fees in an environment where demand for services fluctuates risks setting fees too high or too low.  There may be adjustments to account for this, but neither APHIS nor Grant Thornton has explained their approach to this problem.  In addition, Grant Thornton's forecasts assume that projected costs are fully variable—that, for instance, the costs of two inspections is exactly twice the cost of one.  It is more likely, however, that many of the costs are fixed in the short term and

thus would increase only marginally with an increase in users or inspections.  *See* Final RIA at iii (acknowledging "there are fixed costs related to providing AQI services").  Indeed, APHIS itself has in the past justified fee increases on the ground that its costs do not decline with reduced demand.  *See, e.g.*, *User Fees for Agricultural Quarantine and Inspection Services*, 69 Fed. Reg. 71,660, 71,664 (Dec. 9, 2004).

77.     APHIS also failed to prove that its model correctly pools and assigns costs.  A4A and IATA do not know—and given the data APHIS provided, cannot know—if this step was completed correctly.  A4A requested from APHIS data describing "how USDA/APHIS verifies AQI costs incurred by CBP" and data to quantify the "USDA/APHIS and CBP cost drivers/activities forming the basis of activity-based costing."  Airlines for America, NPRM Comment Letter, Attachment A (June 24, 2015).  APHIS never provided the data.

78.     As an example, the reported cost of commercial aircraft AQI inspections in Fiscal Year 2011 varied by $19,000,000 in separate publications.  The GAO Report issued in March 2013 identified commercial aircraft costs of $175 million dollars.  GAO-13-268, at 10.  In April of the next year, the Proposed Rule listed those costs at $156 million.  79 Fed. Reg. at 22,899.  The Final Rule listed commercial aircraft costs as $161 million.  80 Fed. Reg at 66,756.  The Final Rule justified this drastic variance as follows:  "The difference in FY 2011 costs between the proposed rule and the GAO report resulted from the fact that the GAO report used preliminary results from the AQI user fee model, *i.e.*, the model developed by Grant Thornton to calculate costs used to run the AQI program."  *Id.* at 66,751.  That explanation misses the point:  If the user fee model is so bad at predicting what final costs will be, it cannot be a reliable basis for fixing fees.

79.     After determining the appropriate pool of costs to allocate, the next step in ABC is to assign direct costs to the user groups and indirect costs to the activities required to provide AQI service.  APHIS and CBP have not provided information describing the various activities required to provide AQI services to each person or user, nor sufficient information to determine whether costs are appropriately allocated to these activities.  Nor have APHIS and CBP acknowledged the benefit element of the rule, like risk reduction and task automation that may reduce costs.

80.     APHIS claims in the Final Rule that it bases its cost estimates on "cost drivers," which are "data used to establish a cause and effect relationship between an organization's activities and what it produces."  80 Fed. Reg. at 66,762.  Grant Thornton agrees: "[T]his cost assignment is done using activity drivers . . . based on a cause-and-effect relationship."  Grant Thornton, Fee Setting Process Documentation and Recommendations 8 (Oct 25, 2011).  But APHIS does not reveal what it believes to be the cost drivers, or even the number of inspections, interceptions or other work data, so it is impossible to tell whether its assessment and conclusions are accurate or reliable.

81.     APHIS uses the number of aircraft arrivals to determine the fee by merely dividing the costs assigned to commercial aircraft by an estimate of the number of arrivals.  80 Fed. Reg. 66,756.  But APHIS has not provided any evidence that inspection costs are tied entirely to the number of aircraft arrivals.  In fact, APHIS's own data suggest that its costs per aircraft change with each additional arrival.  *See* Final RIA at 17 tbl. 6 (showing a non-linear relationship between number of aircraft inspected and costs based on "[d]ata used for the commercial aircraft fee calculation"); *see also id.* at iii (acknowledging "there are fixed costs related to providing AQI services.").

82.     Moreover, APHIS' own explanations in the current and previous rulemakings on this subject contradict its assumption that all aircraft cost exactly the same amount to inspect. The agency recognizes that smaller aircraft are cheaper to inspect, estimating that private aircraft inspections cost $90 while commercial aircraft inspections cost $225.  Proposed Rule, 79 Fed. Reg. 22,899-22,900 (figures from tables 2 and 6).  But without explanation, APHIS does not apply this same logic to account for the huge variance in the sizes of commercial aircraft.  In the same vein, it does not charge commercial seagoing vessels of under 100 tons at all.  Such arbitrary categorizations cannot be a product of reasoned decision-making.

83.     APHIS's ABC model also fails to consider how the presence or absence of commercial (that is, non-passenger property) volume, weight or type of commercial cargo drives costs.  APHIS noted in its Final Rule that "increases in cargo volumes necessitate increases in the conveyance fees to recover these expanded cargo inspection costs."  80 Fed. Reg. at 66,760. But it then applied the same increased fee across the board—even for the high percentage of commercial passenger aircraft charged AQI fees that carry zero commercial cargo.

84.     In addition, APHIS stated in the Final Rule that "risk targeting" is a factor that "drive[s] inspection costs."  80 Fed. Reg. at 66,750.  But there is no indication that the ABC model accounts for the relationship between the risk of the cargo (or even presence or absence of commercial cargo) and the inspection cost.  *Id*. at 66,756.  Nor does the Final Rule elaborate at all on what exactly it means by "risk targeting," rendering this vague statement effectively meaningless.  In any event, the majority of cargo transported into the United States aboard commercial passenger aircraft *is* low risk, *i.e.*, consumer electronics and other non-perishables— but APHIS apparently does not account for this fact in its AQI fee structure, even though CBP (the entity performing these inspections) boasts that it is able to "target potentially high-risk

shipments[] and reduce redundant inspection activities."  Testimony of CBP Field Operations Executive Director Kevin Harriger, *Defending American Agriculture Against Foreign Pests and Diseases*, House Subcommittee on Livestock and Foreign Agriculture (Mar. 15, 2016).

85.     Finally, APHIS refused to subject its ABC model to neutral, third-party review or to open it up for examination by stakeholders.  Commenters questioned "the level of scrutiny the model received," but APHIS refused to release additional details that would support the model. 80 Fed. Reg. at 66,750.

86.     Commenters also noted that the ABC model and Grant Thornton's reports have never been peer-reviewed or reviewed by the USDA's Chief Economist.  *Id.* at 66,759.  APHIS answered critics of the model with the conclusory statement that its decisions were "well-informed," without releasing any of the reports or reviews that informed them.  *Id.*  APHIS to date has not even confirmed that *the agency itself* reviewed Grant Thornton's ABC model and its underlying data before (selectively) relying on it to justify the fee increases.

## COUNT I: VIOLATION OF THE FACT ACT AND THE ADMINISTRATIVE PROCEDURE ACT
### (21 U.S.C. § 136a, 5 U.S.C. § 500 *et seq.*)

### Non-Compliance with FACT Act Prohibition Against A Duplicative Commercial Aircraft Fee

87.     Plaintiffs incorporate and reallege each allegation contained in the previous paragraphs of the Complaint as though fully set forth herein.

88.     The Final Rule violates the FACT Act's requirement that the "costs of the services with respect to passengers as a class includes the costs of related inspections of the aircraft or other vehicles," because it charges air passengers a fee to cover inspection costs, then charges an additional fee to commercial carriers for inspecting that same aircraft.  21 U.S.C. § 136a(a)(2).  The Final Rule charges commercial aircraft carrying only passengers the same fee

charged to cargo-only aircraft, despite the fact that for passenger aircraft, the fees paid by

passengers do and are required to "include[] the costs of related inspections of the aircraft."  *Id.*

89.     The Final Rule is also arbitrary and capricious in violation of 5 U.S.C. § 706(A),

because imposing a duplicative commercial aircraft fee directly contradicts the fee model

established by APHIS's own consultant, Grant Thornton, which proposed the $4 air passenger

fee only after determining that the air passenger fee was adequate to recover all the costs of

inspecting both passengers and the aircraft.  APHIS cannot follow Grant Thornton's model for

some fees, while for other fees adopting—without principled explanation or justification—an

alternative approach that happens to result in millions of dollars of greater revenues to APHIS.

### COUNT II: VIOLATION OF THE FACT ACT AND THE ADMINISTRATIVE PROCEDURE ACT
### (21 U.S.C. § 136a, 5 U.S.C. § 704 *et seq.*)

### Non-Compliance with FACT Act Prohibition on Cross-Subsidization

90.     Plaintiffs incorporate and reallege each allegation contained in the previous

paragraphs of the Complaint as though fully set forth herein.

91.     The Final Rule violates the FACT Act and the APA because it collects AQI fees

from one user group to pay costs incurred inspecting another group or for other non-AQI

purposes.

92.     The FACT Act requires fees to be "commensurate with the costs of agricultural

quarantine and inspection services with respect to the class of persons or entities paying the

fees."  21 U.S.C. § 136(a)(2).  As APHIS recognizes, this requirement "is intended to avoid

cross-subsidization" across user classes, *e.g.*, charging commercial aircraft a fee exceeding

inspection costs and using the additional proceeds to cover the costs of inspecting private

aircraft, cruise ships, or trucks.  Final Rule, 80 Fed. Reg. 66,748.

93.     Without data establishing that the cost of inspecting commercial aircraft is $225—let alone $225 more than the amount recovered by the passenger fee for passenger flights—the only conclusion to draw from APHIS tripling the inspection fee is that the agency is using this increased fee to continue cross-subsidizing other user classes, or for other non-AQI purposes entirely.  APHIS has never provided the underlying cost data necessary to establish its compliance with the prohibition against cross-subsidization.  Indeed, the Final Rule's accompanying Regulatory Impact Analysis expressly acknowledges that, at least for inspected entities that pay no fee, the agency feels free to cross-subsidize in violation of the FACT Act.  *See* Final RIA at 27 ("AQI services received by classes that do not pay user fees are covered through appropriated funding or a portion of user fees otherwise collected.").

94.     Moreover, from the limited data available, from the GAO Reports on the AQI program, and from *the APHIS administrator's own statements*, it is evident that such cross-subsidization was occurring *before* the Final Rule imposed its new fee structure.  The GAO noted that in fiscal years 2010 and 2011 alone, commercial airline passengers were overcharged a total of $275 million.  But these excess fees collected in those and possibly other years before or since have not been accounted for, and certainly have not been remitted to passengers or used to cover aircraft inspection costs.  The best indication of what was done with this money collected from air passengers and required to be spent on inspections of passengers and their aircraft comes from APHIS Administrator Kevin Shea, who stated that APHIS "could not operate" the AQI program *at all* if the passenger fees were immediately lowered to reflect actual costs.  This confirms that the overcharges borne by passengers were used to pay for inspecting other user classes, in direct violation of the FACT Act.

95.     The Final Rule continues this pattern of prohibited cross-subsidizing.  Because it offers no meaningful, confirmable explanation of how the $225 commercial aircraft fee was "commensurate" with inspection costs, or necessary at all for aircraft carrying passengers in light of the passenger fee, the Final Rule violates the FACT Act and is arbitrary and capricious under the APA.

## COUNT III: VIOLATION OF THE FACT ACT AND THE ADMINISTRATIVE PROCEDURE ACT
### (21 U.S.C. 136a, 5 U.S.C. § 500 *et seq.*)

### No Statutory Authority to Maintain a Reserve

96.     Plaintiffs incorporate and reallege each allegation contained in the previous paragraphs of the Complaint as though fully set forth herein.

97.     The Final Rule violates the FACT Act and the APA because it establishes fees based on APHIS's interest in maintaining a "reserve," which is prohibited by the FACT Act.

98.     APHIS made clear that it was seeking to collect additional fees "to ensure that revenue is sufficient to maintain the reserve balance."  80 Fed. Reg. 66,753.  The Final Rule states that APHIS's fees were increased in part to recover the additional cost of maintaining a "reasonable balance" or "reserve."  *Id.* 66,748; *see also id.* at 66,753 ("To fund the reserve, these base fees are increased by 3.5 percent.").

99.     To justify this reserve, the Final Rule cites to 21 U.S.C. § 136a(a)(1)(C).  But that subsection currently provides: "The Secretary of Agriculture may prescribe and collect fees sufficient . . . **through fiscal year 2002, to maintain a reasonable balance** in the Agricultural Quarantine Inspection User Fee Account established under paragraph (5)."  21 U.S.C. § 136(a)(1)(C) (emphasis added).

100.     APHIS lacks the statutory authority to collect fees to fund its reserve and has

lacked that authority since 2002.  Therefore, all fees APHIS collected after 2002 for purposes of

endowing its reserve were unlawful under the FACT Act.

101.     Even if APHIS were authorized to maintain a reserve, the agency could only

justify AQI fee levels that include amounts above costs for reserves if it provided information

sufficient to determine that the reserve amount was not excessive, and that it has controls in

place to ensure that reserve amounts collected from one class of user are used solely for that type

of user.  But the agency has not shared data regarding the current AQI reserve or the reserve for

each user class.  As noted above, in fiscal years 2010 and 2011 air passengers, as a class, paid

more than $275 million above the cost of services performed for their user group.  Yet APHIS

has not assured stakeholders that money was put in an AQI reserve fund for inspections of air

passengers and their aircraft.  Indeed, the agency has suggested that it feels free to spend money

in its aggregated reserve account in any manner it sees fit, in violation of the FACT Act.  *See*

Remarks of Administrator Kevin Shea, Final Transcript, AQI Stakeholder Webinar, at 27 (Jan.

13, 2015), *available at*

https://www.aphis.usda.gov/import_export/plants/plant_imports/aqi/downloads/transcript.pdf

("The fees are set by mode, but the overall [reserve] account is not.  So there is not a separate

reserve account for passengers versus railcars. . . . All revenue is aggregated.").

102.     APHIS's unexplained, unlawful reserve violates both the FACT Act and the APA.

**COUNT IV: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**(5 U.S.C. § 500 *et seq.*)**

**Lack of Reasoned Decision-Making**

103.     Plaintiffs incorporate and reallege each allegation contained in the previous

paragraphs of the Complaint as though fully set forth herein.

104.     APHIS's Final Rule violates the APA because APHIS did not engage in reasoned decision-making to justify tripling the commercial aircraft fee or to justify charging any aircraft fee on flights carrying passengers.  Based on the information in the public record, it is impossible to determine how APHIS quantified its AQI fee levels for each class of user.  For example, in the Final Regulatory Impact Analysis, CBP costs are provided as lump sums by user that in some years exceed $100 million annually without any explanation of the cost drivers for these amounts.  Further, it is impossible to determine whether APHIS complied with its statutory mandate that fees not exceed costs on an absolute and by user type basis.  In fact, APHIS decided, without providing a justification, to disregard the reasoned recommendations of its AQI-fee consultant regarding how fees should be charged to cargo-only and passenger aircraft. APHIS's fee-setting process thus was not logical or rational, and must be set aside.  5 U.S.C. § 706(2)(A).

105.     Moreover, APHIS has applied its ABC methodology to critically flawed cost data. The GAO, the Inspectors General of the Departments of Homeland Security and Agriculture, and APHIS's own consultant have criticized CBP and APHIS's data over the course of more than a decade.  Yet APHIS continues to rely on flawed data in setting AQI fees, with no explanation of how or whether it has sought to account for this shortcoming.  APHIS's use of the ABC methodology is arbitrary and capricious, because APHIS has failed to provide the information necessary to establish that its model was correctly constructed, thus depriving regulated entities of a meaningful opportunity to comment.

106.     APHIS's fee-setting process is also impermissibly opaque.  The GAO encouraged APHIS to "improve the transparency of the regulatory process of setting AQI fee rates by providing clearer information about how the rates for each of the fee types . . . are determined."

Yet APHIS has continued to apply AQI fees in the same manner as it did before the GAO put it on notice—providing minimal details regarding its underlying cost calculations, and making no attempt to show these costs justify the fee increases. To set a $225 fee for commercial aircraft—and to set any fee at all for aircraft whose inspection is covered by the passenger fee—with so little justification and no meaningful opportunity for stakeholders to comment is arbitrary and capricious.

107. Because it is arbitrary and capricious to conduct any rulemaking in this manner—particularly one resulting in hundreds of millions of dollars in fees annually—the Final Rule violates the APA's requirement of reasoned decision-making, and the imposition of the Rule's $225 fee on any commercial aircraft—passenger or cargo-only—must be enjoined.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS respectfully request that this Court:

A.      Enter judgment for Plaintiffs and against the Defendants;

B.      Enter a declaratory judgment that the Final Rule's imposition of a $225 commercial aircraft fee is invalid because it is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law" within the meaning of the APA;

C.      Enter a declaratory judgment that the Final Rule's imposition of a commercial aircraft fee is invalid because it is outside the scope of, not authorized by, and otherwise contrary to and violates the FACT Act or is otherwise contrary to federal law;

D.      Enter a declaratory judgment that the Final Rule's imposition of a commercial aircraft fee is arbitrary, capricious, and contrary to law, and enjoin Defendants from collecting that fee;

E.      Enter an injunction enjoining Defendants from charging AQI fees for any

commercial aircraft; and

F.      Grant Plaintiffs such additional or different relief as it deems just and proper,

including an award of reasonable attorneys' fees and the costs of this action.

Dated: May 13, 2016                              Respectfully submitted,


                                                 /s/ Jonathan D. Hacker
                                                 Jonathan D. Hacker (D.C. Bar #456553)
                                                 Benjamin G. Bradshaw (D.C. Bar #460539)

                                                 O'MELVENY & MYERS LLP
                                                 1625 Eye St. N.W.
                                                 Washington, D.C. 20006
                                                 Tel: 202-383-5163
                                                 bbradshaw@omm.com
                                                 jhacker@omm.com

                                                 *Attorneys for Plaintiffs Airlines for America*
                                                 *and International Air Transport Association*