**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **AIR TRANSPORT ASSOCIATION** | ) |
| **OF AMERICA, INC.** *d/b/a* | ) |
| **AIRLINES FOR AMERICA,** *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) **Civil Action No. 16-919 (RMC)** |
| **UNITED STATES DEPARTMENT** | ) |
| **OF AGRICULTURE,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

_____

**OPINION**

The Agriculture Quarantine Inspection program is an essential part of the nation's efforts to secure its plants and animals from pests and diseases that are not native to the territory of the United States. The Animal and Plant Health Inspection Service (APHIS), an agency within the Department of Agriculture, works with Customs and Border Protection (CBP), an agency within the Department of Homeland Security (DHS), to inspect all persons and vessels entering the United States. In 1990, Congress ordered APHIS to charge its costs for the required inspections to the applicable classes of users; since then, APHIS has proposed various rules concerning fees for different user classes. In 2015, APHIS adopted a rule which set a new fee structure. Under that rule, international airline passengers are charged a Passenger Fee of $3.96 (reduced from $5) and international commercial aircraft are charged a Commercial Aircraft Fee of $225 (increased from $70.75). The Air Transport Association of America, Inc. and the International Air Transport Association (collectively, Plaintiffs) challenge the validity of the rule. They argue that it is inconsistent with the governing statutory provisions and violates the Administrative Procedure Act (APA), 5 U.S.C. § 500 *et seq.* (2012).

Having studied the parties' briefs, oral arguments, and the entire record, the Court finds that (1) Plaintiffs' claims are not time-barred; (2) APHIS's actions were consistent with the governing statute in charging both an air passenger fee and commercial aircraft fee to passenger aircraft; (3) APHIS has not unlawfully engaged in cross-subsidization; (4) APHIS and Grant Thornton, LLP reasonably relied on the fiscal year (FY) 2010 and 2011 data; and (5) Plaintiffs were not harmed by the withholding of some data during the notice and comment period. The Court also finds that after FY02, the governing statute no longer permitted APHIS to set fees in order to maintain a reasonable balance, which APHIS used to fund its reserve account. Thus, the Court will deny Defendants' motion to dismiss, grant summary judgment to Defendants on Counts I, II, and IV, and grant summary judgment in favor of Plaintiffs on Count III and remand this part of the rulemaking for further consideration and possible rulemaking by APHIS.

## I. BACKGROUND

APHIS has been inspecting "persons and vessels entering the customs territory of the United States for possible infection or infestation with pests and diseases that threaten the resident flora and fauna" of the United States for over a century. Defs.' Mem. of P. & A. in Supp. of Their Mot. to Dismiss and for Summ. J. and in Opp'n to Pls.' Mot. for Summ. J. (APHIS Opp'n) [Dkt. 24-1] at 1; *see also* Plant Protection Act, 7 U.S.C. § 7701 *et seq.* (2010); 7 C.F.R. § 330.105. The inspections are conducted through the Agricultural Quarantine Inspection (AQI) program. Prior to the enactment of the Food, Agriculture, Conservation, and Trade (FACT) Act of 1990, Pub. L. No. 101-624, § 2509, 104 Stat. 3359, 4069-70 (1990) (current version at 21 U.S.C. § 136a (2013)), the costs of AQI were covered by annual appropriations to the Department of Agriculture.

However, in 1990, Congress enacted the FACT Act, which "authorizes [APHIS] to collect user fees for certain agricultural quarantine and inspection (AQI) services." Final Rule at AR229.[1] Because the terms of the statute have changed over time, and are integral to the current dispute, the Court details the legislative history. As originally enacted, the FACT Act provided that

> The Secretary of Agriculture . . . may prescribe and collect fees to cover the cost of providing agricultural quarantine and inspection services in connection with the arrival at a port in the customs territory of the United States, or the preclearance or preinspection at a site outside the customs territory of the United States, of a commercial vessel, commercial aircraft, commercial truck, or railroad car.

§ 2509(a)(1). The FACT Act was first amended in 1990 to add "international passengers" as a class of persons responsible for paying an AQI fee. *See* Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 1203, 104 Stat. 1388, 1388-11 (1990). The original FACT Act required the Secretary to set and adjust the fees:

> to reflect the cost to the Secretary in administering such subsection, in carrying out the activities at ports in customs territory of the United States and preclearance and preinspection sites outside the customs territory of the United States in connection with the provision of agricultural quarantine inspection services, and in maintaining a reasonable balance in the Account.

§ 2509(a)(4).

Congress further amended the FACT Act in 1991. As relevant, the 1991 amendment specified that inspection fees may only be collected in an amount commensurate with the costs of inspection for each class of persons or entities paying the fees. *See* Food,

---

[1] The Administrative Record is located on the Electronic Case Filing (ECF) system at docket numbers 30 and 31.

Agriculture, Conservation, and Trade Act Amendments of 1991, Pub. L. No. 102-237, § 1015, 105 Stat 1818, 1902 (1991).

> Fees, including fees from international airline passengers and commercial aircraft operators, may only be collected to the extent that the Secretary reasonably estimates that the amount of the fees are commensurate with the costs of agricultural quarantine and inspection services with respect to the class of persons or entities paying the fees. *The costs of such services with respect to passengers as a class includes the costs of related inspections of the aircraft.*

*Id*. § 1015(a)(1)(D) (emphasis added). The meaning of the highlighted sentence is strongly disputed here. In response, APHIS set initial fees in 1991 and 1992; for international air passengers the fee was $2.00 and for commercial aircraft the fee was $76.75. See 56 Fed. Reg. 14837, 14845 (April 12, 1991) (setting $2 international air passenger fee); 57 Fed. Reg. 755, 769 (Jan. 9, 1992) (setting $76.75 commercial aircraft fee).

### A. 1996 Amendment

The FACT Act was amended again as part of the Federal Agriculture Improvement and Reform Act of 1996. *See* Pub. L. No. 104-127, § 917, 110 Stat. 888, 1187-88 (1996) (codified at 21 U.S.C. § 136a (2013)). That amendment created a temporary Agricultural Quarantine Inspection User Fee Account in the Department of the Treasury where, for FY96 through FY02, "all of the fees collected under this subsection and late payment penalties and interest charges collected" as part of AQI were held. 21 U.S.C. § 136a(a)(5)(A) (1996). After FY02, the balance in the Treasury account was to be "credited to the Department of Agriculture accounts that incur the costs associated with the provision of agricultural quarantine and inspection services and the administration of this subsection." *Id*. § 136a(a)(6). In addition to

creating a temporary account to hold AQI fees, the 1996 amendment revised the section

describing the authorized fees.

> (1) Fees authorized
>
> The Secretary of Agriculture may prescribe and collect fees sufficient—
>
>> (A) to cover the cost of providing agricultural quarantine and inspection services in connection with the arrival at a port in the customs territory of the United States, or the preclearance or preinspection at a site outside the customs territory of the United States, of an international passenger, commercial vessel, commercial aircraft, commercial truck, or railroad car;
>>
>> (B) *to cover the cost of administering this subsection*; and
>>
>> (C) *through fiscal year 2002, to maintain a reasonable balance in the Agricultural Quarantine Inspection User Fee Account established under paragraph (5).*

*Id*. § 136a(a) (emphasis added). As before, the meaning and relevance of the emphasized

sentences are hotly contested.

### B. Regulatory History

From the time it set the first inspection fees in 1991, APHIS has indicated that the

costs covered by the AQI fee were intended to include "the total cost of delivery costs, program

support costs, and agency-level support costs, as well as funding the reserve." APHIS Opp'n at

8 (citing 56 Fed. Reg. 8148, 8151 (Feb. 27, 1991)). Described as a "reasonable balance," the

reserve was designed to cover three months' average operating costs for the AQI program, *see*

1992 Interim Rule at AR71769, and was necessary because fees were (and are) remitted in

arrears and the agency needed to be prepared to handle emergencies or unexpected volumes. *See*

56 Fed. Reg. at 8151. As APHIS explained most recently:

> The reserve fund ensures that AQI program operations can continue without interruption when service volumes fluctuate due to economic conditions or other circumstances and CBP and APHIS

5

are able to adjust their activity to account for the changed economic conditions.

Proposed Rule at AR18. Until this litigation, no user has challenged funding the reserve.

Between FY92 and FY96, the overall cost of the AQI program went from $85,922,000 to a projected $127,027,001. *See* 62 Fed. Reg. 3823, 3823 (Jan. 27, 1997). At that point, APHIS recognized that the requirements of notice-and-comment rulemaking to reset fees was causing user fees to "lag behind the level of current costs." *Id.* at 3824. In response, APHIS set a schedule of increasing fees for FY97 through FY 2002. *See* 62 Fed. Reg. 39747, 39747-48, 39754 (July 24, 1997). This effort was not fully successful and APHIS further amended the fee schedule in 1999 to cover increasing costs. *See* 64 Fed. Reg. 43103, 43103 (Aug. 9, 1999).

The attack of September 11, 2001 on the World Trade Center in New York City caused a major decline in international passenger and cargo traffic into the United States. Another result of the attack was increased security concerns that required increased inspections. *See* 69 Fed. Reg. 71660, 71660-61 (Dec. 9, 2004). As part of the response to September 11, Congress passed the Homeland Security Act of 2002, which "transferred AQI inspections from the U.S. Department of Agriculture (USDA) to the Department of Homeland Security (DHS) and left certain other AQI responsibilities at USDA." May 2006 GAO Rep. at AR69965. Thereafter, and continuing to the present, CBP conducts all port-of-entry inspections (sea, land, and air) and APHIS provides scientific guidance, training, pest identification, risk analysis, and other related services. *See id.* at AR69965 ("In March 2003, more than 1,800 agriculture specialists within USDA's Animal and Plant Health Inspection Service (APHIS) became DHS Customs and Border Protection (CBP) employees, while USDA retained responsibility for AQI activities such as setting inspection policy, providing training, and collecting user fees."). AQI fees collected by APHIS are now shared with CBP to cover the costs of that agency's services. In addition,

CBP receives annual appropriated funds to cover the costs of inspection services where a fee is not collected. *See* Final Rule at AR253. APHIS issued an interim rule in 2004, raising fees to address the increased costs that followed after September 11. *See* May 2006 GAO Rep. at AR69998.

The number of international passengers and goods has again increased since 2004, although there was a slight downturn associated with the 2008 recession. *See* AQI Q&A at AR116; Stakeholder Webinar Tr. at AR171. During this period, APHIS has experienced significant fee shortfalls. Stakeholder Webinar Tr. at AR172, 177.

### C.  GAO and OIG Investigations

The AQI program has been the subject of numerous Government Accountability Office (GAO) and DHS Office of Inspector General (OIG) investigations and studies since CBP became primarily responsible for conducting the inspections in 2003. GAO focused on monitoring the success of the transition from a purely APHIS-run program to the combined APHIS/CBP program. GAO first issued a report in May 2006, finding that CBP was understaffed, failed to develop an adequate way to evaluate performance, and lacked sufficient data on the cost of the AQI program to determine appropriate AQI fees. *See* May 2006 GAO Rep. at AR69965, 69970-73, 69999. A February 2007 OIG audit further identified issues with CBP data systems, which resulted in incomplete data and an inability to set AQI fees accurately. *See* Feb. 2007 OIG Rep. at AR70744-48. In September 2007, a GAO report addressed the challenges faced by CBP in administering three separate international air passenger inspections, which are funded by three separate statutes. *See* Sept. 2007 GAO Rep. at AR70039 (explaining that CBP is responsible for customs, immigration, and agricultural inspections of incoming international passengers). A February 2008 GAO study again found that CBP lacked sufficient data to track the actual cost of each type of inspection for each type of user class. *See* Feb. 2008

GAO Rep. at AR70129-30.  In September 2012, the GAO conducted further review and again

found significant data reliability issues and inherent data limitations associated with the AQI

program.  *See* Sept. 2012 GAO Rep. at AR70267-68, 70277-80.  Finally, in March 2013, GAO

noted a significant difference between costs and fees collected and recommended increasing AQI

fees.  *See* March 2013 GAO Rep. at AR70568, 70579-84.

### D.  Current Rulemaking

Despite repeated attempts to adjust fees, as of the rulemaking in 2014-2015

APHIS was still not recovering enough fees to cover the costs of AQI inspections.

> The AQI fees have not been adjusted since FY 2010 and do not
> reflect the current cost of providing AQI services.  As a result, U.S.
> Customs and Border Protection (CBP) of the Department of
> Homeland Security, which collaborates with APHIS in
> providing . . . AQI services . . . , has relied more heavily on its
> appropriated funds to provide AQI services that are not paid for by
> AQI revenue or to cover the cost of services for which the current
> fee revenue is insufficient.

Final Rule at AR230.  This time, APHIS retained Grant Thornton LLP, an international audit,

tax, and advisory firm, to develop a model that calculated the appropriate fee for each user class

based on the actual costs associated with inspecting that user class.  Grant Thornton used an

"activity-based costing (ABC) methodology" to determine the appropriate fee for each user class

based on the specific costs that were attributed to inspections for that class.  May 2012 Grant

Thornton Rep. at AR636.  The accountants first assigned all associated AQI costs to a specific

activity and then matched each activity to a corresponding class of persons or entities.  March

2012 Grant Thornton Rep. at AR442.  Despite flaws in the data, Grant Thornton used what was

available from FY10 and FY11 to conduct its analysis.

APHIS submitted a proposed new rule for notice and comment on April 25, 2014.

Hundreds of comments were received over the next 90 days, *see* Final Rule at AR230, and

APHIS issued the Final Rule (Final Rule or Rule) on October 29, 2015, which decreased the air

passenger fee to $3.96 (from $5) and increased the commercial aircraft fee to $225 (from

$70.75). *See* Final Rule at AR229-60. The related regulation has long defined "commercial

aircraft" as "[a]ny aircraft used to transport persons or property for compensation or hire." 7

C.F.R. § 354.3(a).

Plaintiffs submitted comments objecting to the proposed rule and questioning "the

application of the commercial aircraft fee to passenger aircraft, the rounding up of fees to fund

the AQI reserve, and the nature and quality of the information published in the rulemaking

docket." APHIS Opp'n at 16 (citing Comments of Airlines for America at AR71133-49). After

the Rule was published, on May 13, 2016, Plaintiffs filed suit. The Complaint advances four

alleged violations of the APA:

> Count I: The Rule violates the FACT Act's prohibition against
> duplicative commercial aircraft fees;
>
> Count II: The Rule violates the FACT Act's prohibition on cross-
> subsidization of fees among user classes;
>
> Count III: The Rule maintains a reserve, in violation of the FACT
> Act removal of APHIS's authority to maintain a reserve after 2002;
> and
>
> Count IV: The Rule was adopted without reasoned decision-making
> due to unreliable data and data which was withheld from
> commenters.

Compl. [Dkt. 1] at 36, 37, 39, 40. Defendants answered on July 18, 2016. *See* Answer [Dkt.

15]. Plaintiffs moved for summary judgment on all claims on March 15, 2017. *See* Mem. of

Law in Supp. of Pls.' Mot. for Summ. J. [Dkt. 20-1] (Pls.' Mot.). Defendants opposed and filed

a combined cross motion for summary judgment and motion to dismiss Counts I and III as time

barred on May 8, 2017. APHIS Opp'n. Plaintiffs filed a consolidated reply and opposition on

June 29, 2017, *see* Pls.' Consol. Opp'n to Defs.' Cross-Mot. for Summ. J. and Reply Br. in Supp.

of Pls.' Mot. for Summ. J. [Dkt. 26] (Pls.' Opp'n), and Defendants replied. *See* Defs.' Reply

Mem. in Supp. of Their Mot. to Dismiss and for Summ. J. [Dkt. 28] (APHIS Reply). The Court

conducted oral argument on March 13, 2018. The motions are ripe for review.

## II. LEGAL STANDARD

### A. Motion to Dismiss – Statute of Limitations

An affirmative defense that claims are barred by a statute of limitations may be

asserted in a Rule 12(b)(6) motion "when the facts that give rise to the defense are clear from the

face of the complaint." *Smith-Haynie v. District of Columbia,* 155 F.3d 575, 578 (D.C. Cir.

1998). A court may only rule on a statute of limitations defense under Rule 12(b)(6) when the

face of the complaint conclusively shows that it is time-barred. *See Performance Contracting,*

*Inc. v. Rapid Response Constr., Inc.,* 267 F.R.D. 422, 425 (D.D.C. 2010) (citing *Smith-Haynie,*

155 F.3d at 578); *see also Lewis v. Bayh,* 577 F. Supp. 2d 47, 51 (D.D.C. 2008); *Turner v. Afro-*

*American Newspaper Co.,* 572 F. Supp. 2d 71, 72 (D.D.C. 2008).

### B. Motion for Summary Judgment – Fed. R. Civ. P. 56

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall

be granted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "In a case involving review of a final agency

action under the Administrative Procedure Act, however, the standard set forth in Rule 56[ ] does

not apply because of the limited role of a court in reviewing the administrative record." *Sierra*

*Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006) (internal citation omitted), *appeal*

*dismissed*, Nos. 06-5419 & 07-5004, 2007 WL 1125716 (D.C. Cir. Mar. 30, 2007); *see also*

*Charter Operators of Alaska v. Blank*, 844 F. Supp. 2d 122, 126-27 (D.D.C. 2012); *Buckingham*

*v. Mabus*, 772 F. Supp. 2d 295, 300 (D.D.C. 2011). Under the APA, the agency's role is to

resolve factual issues to reach a decision supported by the administrative record, while "'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Sierra Club*, 459 F. Supp. 2d at 90 (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985)). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).

### C.  Administrative Procedure Act

The APA, requires courts to review agency actions and determine if they are arbitrary, capricious, or not in accord with the law.  5 U.S.C. § 706(2)(A); *see also Tourus Records, Inc. v. DEA*, 259 F.3d 731, 736 (D.C. Cir. 2001).  Its basic legal tenets are longstanding and clear.  In determining whether an action was arbitrary and capricious, a reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks and citation omitted).  At a minimum, the agency must have considered relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986) (internal quotation marks and citation omitted); *see also Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result.").

An agency action usually is arbitrary or capricious if:

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not

be ascribed to a difference in view or the product of agency
expertise.

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As

the Supreme Court has explained, "[t]he scope of review under the 'arbitrary and capricious'

standard is narrow and a court is not to substitute its judgment for that of the agency." *Id.*

Rather, agency action is normally "entitled to a presumption of regularity." *Citizens to Pres.*

*Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano*

*v. Sanders*, 430 U.S. 99 (1977).

### D. Jurisdiction and Venue

The Court has federal question jurisdiction, *see* 28 U.S.C. § 1331; 5 U.S.C. § 500

*et seq.*, because this lawsuit arises under a federal statute. Venue is proper because Plaintiffs and

the Department of Agriculture, APHIS's parent agency, reside in the District of Columbia and a

substantial part of the events at issue occurred in the District. *See* 28 U.S.C. § 1391(e)(1); *see*

*also Dehaemers v. Wynne*, 522 F. Supp. 2d 240, 248 (D.D.C. 2007); *Hunter v. Johanns*, 517 F.

Supp. 2d 340, 344 (D.D.C. 2007).

## III. ANALYSIS

### A. Motion to Dismiss

Defendants begin by moving to dismiss Counts I and III, pertaining to duplicative

charges and the legality of the reserve account respectively, as time-barred. Defendants argue

that its fee division between passengers and aircraft and its maintenance of a reserve account are

both long standing and that Plaintiffs did not complain about either within six years of their

origination, which is required to bring civil actions against the United States. *See* 28 U.S.C.

§ 2401(a). Specifically, Defendants argue that the final agency action that resulted in separate

fees for passengers and commercial aircraft occurred in 1992, almost 25 years ago, and APHIS

has included a funding for a reserve in its fee calculations since an interim rule in 2002 which was finalized in 2003. Defendants contend that the 2015 rulemaking never considered or addressed either established principle and therefore did not reopen them for new objections or restart the statute of limitations.

Not surprisingly, Plaintiffs disagree. They argue that the Rule represented new agency action and they can object to all parts of it, even if some portions were not revised or re-evaluated in 2015.

It is clear that any challenge to a final agency action must be made within 6 years. *See* 28 U.S.C. § 2401(a). When a pre-existing rule or policy is challenged, the "re-opening doctrine" governs whether it is reviewable. "[W]here an agency's actions show that it has not merely republished an existing rule in order to propose minor changes to it, but has reconsidered the rule and decided to keep it in effect, challenges to the rule are in order." *Public Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147, 150 (D.C. Cir. 1990). To determine whether an agency reconsidered a rule, a court

> look[s] to the entire context of the rulemaking including all relevant proposals and reactions of the agency to determine whether an issue was in fact reopened. If in proposing a rule the agency uses language that can reasonably be read as an invitation to comment on portions the agency does not explicitly propose to change, or if in responding to comments the agency uses language that shows that it did in fact reconsider an issue, a renewed challenge to the underlying rule or policy will be allowed.

*Id*. However, a commenter cannot force an agency to reopen an issue by offering an unsolicited comment and getting a response. "[A]n agency does not reopen a rulemaking or policy determination 'merely by responding to an unsolicited comment by reaffirming its prior position,'" *CTIA v. FCC*, 466 F.3d 105, 110 (D.C. Cir. 2006) (quoting *Kennecott Utah Copper Corp. v. Dep't of Interior*, 88 F.3d 1191, 1213 (D.C. Cir. 1996)), or "by responding to a

comment that addresses a settled aspect of some matter, even if the agency had solicited comments on unsettled aspects of the same matter." *Kennecott*, 88 F.3d at 1213.

In its initial report, Grant Thornton explained that it was retained to "conduct a comprehensive fee review to determine the full cost of AQI services, identify potential changes to the fee structure, and recommend new fees." Oct. 2011 Grant Thornton Rep. at AR414; *see also* Proposed Rule at AR10 ("APHIS recently conducted a comprehensive fee review to determine the current cost of specific AQI services supported by these fees."); Sept. 2012 GAO Rep. at AR70277 ("In October 2010, APHIS hired a contractor to conduct a comprehensive fee review to determine the full cost of AQI services, identify potential changes to the fee structure, and recommend new fees."). Consistent with these statements, the 2014-2015 AQI rulemaking was not simply a change in fee amounts, but constituted a wholesale re-evaluation of the system used to evaluate costs and determine fees, with the introduction of a new methodology. Grant Thornton evaluated the entire structure of the AQI fee system and made recommendations for significant changes in an effort to recoup the actual costs of the services provided to each user class. For example, Grant Thornton recommended ending the AQI fee cap for maritime vessels and railcars, *see* May 2012 Grant Thornton Rep. at AR639-640, and appeared to recommend moving from a fee system under which passengers paid a fee and the aircraft on which they flew paid a separate commercial fee, to a fee system under which passengers paid a fee that covered their plane and only strictly-cargo aircraft paid a commercial fee. *Compare* March 2012 Grant Thornton Rep. at AR498 (chart identifying the pre-2015 fee scheme and including inspection of passenger aircraft with commercial aircraft fee) *with id*. at AR501-502 (Grant Thornton

proposals that included passenger aircraft inspection in the passenger (Air Pax) fee.[2] These

charts show that so-called "duplicative charges" ("passenger fee" and "commercial aircraft fee"

levied on all passenger aircraft) were considered during the APHIS rulemaking. There is thus no

time bar to Plaintiffs' arguments about duplicative fees.

　　　　Evaluation of whether the authority to fund a reserve account was "re-opened" by

the 2015 rulemaking proves more difficult. APHIS argues that it did not reopen any aspect of

the reserve account in the 2015 rulemaking; therefore, Plaintiffs' reserve claim is untimely and

should be dismissed. Although APHIS publically stated that the purpose of the rulemaking was

a "comprehensive fee review," Grant Thornton did not appear to re-examine the need or reasons

for a reserve account. To the contrary, one of the explicit calculations by Grant Thornton

addressed the appropriate amount to fund the reserve and how to include it in the fees, but not

whether it should be continued. *See* Oct. 2011 Grant Thornton Rep. at AR416-17 ("The next

step was to determine what the reserve component of the total costs should be. This amount was

based on an estimate of the reserve . . . required to run the operations of the AQI program for 3

months or 25% of the year. APHIS decided to build this reserve over three years, thus achieving

the desired amount by FY2007."); *see also* Proposed Rule at AR10 ("The proposed adjustments

will also allow us to maintain the AQI reserve account.").

　　　　The Court, however, evaluates "the entire context of the rulemaking" and finds

that APHIS was not "merely republish[ing] an existing rule" with minor changes, but instead

conducted an extensive review of the prior rule as a whole. *Public Citizen*, 901 F.2d at 150. The

fact that Grant Thornton did not specifically question the existence of a reserve account does not

---

[2] The Court recognizes this recommendation, and the data upon which it rests, is contested by the
parties and discusses that challenge *infra* at section III.B.

diminish the comprehensive nature of the 2015 rulemaking. Although the question is a close one, the Court finds Plaintiffs' reserve claim timely and will deny Defendants' motion to dismiss.

### B. Duplicative Commercial Aircraft Fee

At the heart of their case, Plaintiffs argue that APHIS's "decision to impose a separate commercial aircraft inspection fee for arriving passenger flights on top of the individual air passenger fee directly violates the plain language of the FACT Act" and contradicts the conclusions of APHIS's economic expert, Grant Thornton. Pls.' Mot. at 19-20. Plaintiffs identify multiple concerns based on the FACT Act: (1) the statute directs that "[t]he costs of the services with respect to passengers as a class includes the costs of related inspections of the aircraft or other vehicle," 21 U.S.C. § 136a(a)(2), which APHIS allegedly ignored; (2) consistent with the FACT Act, Grant Thornton recommended AQI fees of $4 per inbound air passenger and $225 per inbound commercial aircraft and, in that calculation, defined "commercial aircraft" as those airplanes carrying only cargo, which APHIS ignored; and (3) APHIS does not adequately support its decision to charge both a passenger fee and a commercial aircraft fee on the same flight. Plaintiffs identify three alleged inadequacies in APHIS's explanation: (1) APHIS failed to justify treating air and sea passengers differently; (2) APHIS wrongly concluded that AQI inspection of passenger aircraft can be divided into "passenger" inspections and "cargo" inspections; and (3) APHIS offered no justification for treating small passenger aircraft differently from large passenger aircraft.

APHIS responds that the passenger fee and commercial aircraft fee are not duplicative because the passenger fee covers aircraft inspections that are related to passenger flight, *i.e.*, the interior where passengers are located, associated waste and garbage, and passenger luggage, while the aircraft fee covers the remaining costs of inspecting the exterior of

the aircraft, its cargo, and cargo hold. APHIS acknowledges that the costs may not be equal between inspecting a cargo-only aircraft and inspecting the cargo and hold of a plane that also carries passengers. APHIS explains the dichotomy by noting that it was required to determine a fee structure that charged each class of users for the services provided and that would be readily understood and predictable for the international air transport industry and its employees. In its consideration, APHIS weighed its need to administer a clear fee structure against the probability that some passenger-and-cargo aircraft may pay more than the strict costs of the services related to the inspection of any individual flight; it determined that the administrative problems and costs inherent in operating and auditing a fee schedule specific to each unpredictable variation of passenger-only, passenger-and-cargo, and cargo-only aircraft outweighed the harm in overcharging some customers.

As to Plaintiffs' argument that Grant Thornton intended the "commercial aircraft" fee to be charged to cargo-only commercial aircraft, APHIS doubts the weight of the accountants' statements in their report. More critically, the agency argues Grant Thornton calculated the "commercial aircraft" fee by dividing the total costs into the total number of international passenger *and* cargo aircraft, not the number of cargo-only aircraft. Therefore, APHIS insists, despite any contrary language in Grant Thornton's reports, it is appropriately charging the $225 commercial aircraft fee to both passenger and cargo-only aircraft.

*1. Division of costs in the FACT Act – What does the statute intend?*

Whether APHIS may charge both a "passenger fee" to those passengers aboard an international flight and a "commercial aircraft" fee to the airline for AQI inspection services is dependent on the meaning of the term "related" in 21 U.S.C. § 136a(a)(2). Plaintiffs argue the passenger fee must cover the totality of costs related to inspecting the vehicle (truck, bus, ship,

airplane, etc.) in which they arrive, while APHIS argues that passengers are only required to pay for those AQI inspections that are related to their presence in that vehicle.

The FACT Act permits the Secretary to "prescribe and collect fees" to cover the cost of AQI services related to the arrival in the United States of an "international passenger, commercial vessel, commercial aircraft, commercial truck, or railroad car." 21 U.S.C. § 136a(a)(1)(A). The statute provides no definition of "commercial aircraft" but APHIS has defined it to include "[a]ny aircraft used to transport persons or property for compensation or hire." 7 C.F.R. § 354.3(a). When setting fees, the Act requires the Secretary to "ensure that the amount of the fees is commensurate with the costs of agricultural quarantine and inspection services with respect to the class of persons or entities paying the fees," and that "[t]he costs of the services with respect to passengers as a class includes *the costs of related inspections* of the aircraft or other vehicle." 21 U.S.C. § 136a(a)(2) (emphasis added); *see also* March 2013 GAO Rep. at AR70587 ("APHIS's authority permits it to charge all passengers for the cost of inspecting both passengers and the vehicle in which they arrive.").

When reviewing an agency's interpretation of its enabling statute and the laws it administers, courts are guided by "the principles of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 . . . (1984)." *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 754 (D.C. Cir. 2007). *Chevron* established a two-step inquiry to guide the analysis. The initial question is whether "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. If so, then "that is the end of the matter" because both courts and agencies "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. To decide whether Congress has addressed the precise question at issue, a reviewing court applies "'the traditional tools of statutory construction.'" *Fin. Planning Ass'n v. SEC*, 482 F.3d

481, 487 (D.C. Cir. 2007) (quoting *Chevron*, 467 U.S. at 843 n.9).  It analyzes "the text,

structure, and the overall statutory scheme, as well as the problem Congress sought to solve."  *Id.*

(citing *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 796 (D.C. Cir. 2004); *Sierra Club v. EPA*, 294

F.3d 155, 161 (D.C. Cir. 2002)).  When the statute is clear, the text controls and no deference is

extended to an agency's interpretation in conflict with the text.  *Chase Bank USA, N.A. v.

McCoy*, 562 U.S. 195, 210-11 (2011).

   If the statute is ambiguous or silent on an issue, a court proceeds to the second

step of the *Chevron* analysis and determines whether the agency's interpretation is based on a

permissible construction of the statute.  *Chevron*, 467 U.S. at 843; *see also Sherley v. Sebelius*,

644 F.3d 388, 393-95 (D.C. Cir. 2011).  Under *Chevron* Step 2 a court determines the level of

deference due to the agency's interpretation of the law it administers.  *See Mount Royal Joint

Venture*, 477 F.3d at 754.  Where an "agency enunciates its interpretation through notice-and-

comment rule-making or formal adjudication, [courts] give the agency's interpretation *Chevron*

deference."  *Id.* at 754 (citing *United States v. Mead Corp.*, 533 U.S. 218, 230-31 (2001)).  That

is, an agency's interpretation that is permissible and reasonable receives controlling weight, *id.*,

"even if the agency's reading differs from what the court believes is the best statutory

interpretation," *see Nat. Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967,

980 (2005).  An interpretation is permissible and reasonable if it is not arbitrary, capricious, or

manifestly contrary to the statute.  *Mount Royal Joint Venture*, 477 F.3d at 754.  Such broad

deference is particularly warranted when the regulation at issue "concerns a complex and highly

technical regulatory program."  *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)

(internal quotation marks and citation omitted).

The FACT Act states that passenger fees must include "the costs of related inspections of the aircraft or other vehicle." 21 U.S.C. § 136a(a)(2). Plaintiffs want the Court to read "related inspections" to mean all inspections of the vehicle, which would render aircraft passengers, but not the airline, fully responsible for the cost of all inspections of the aircraft in which they arrived. However, Plaintiffs' interpretation of the statute gives no meaning to the word "related." If Congress intended passengers to pay in whole for the inspection of the aircraft in which they arrived, the statute would say that passenger fees must include "the costs of inspections of the aircraft . . . ." By inserting "related" and using it to modify "inspections," Congress specified that passengers are responsible only for the cost of inspecting their persons, belongings, and areas related to their presence on the flight, *i.e.*, such things as the passenger cabin and cabin waste and garbage. To give effect to the statute's limiting language, "related inspections" must be read as referring to inspections of persons, things, and areas that are related to passengers but nothing more. Thus, when CBP inspects the passenger area of an aircraft, passengers must be charged its cost but when CBP inspects cargo (*i.e.*, non-passenger baggage) or non-passenger areas of the aircraft such as the cargo hold and exterior, the cost is unrelated to passengers and cannot be charged to them.

Plaintiffs stress that less than 50% of arriving international passenger aircraft carries cargo and, therefore, those passenger-only flights do not require cargo-related AQI services and should not be charged a commercial aircraft fee. APHIS explained, however, that even if a passenger aircraft does not have cargo onboard when it enters the United States, it might well have carried cargo at some earlier point before entering the United States and AQI inspection is necessary to ensure that an invasive species or other contaminant was not dislodged from the cargo prior to entry. The example cited at oral argument was a passenger aircraft that

flew from Egypt to Paris and then Paris to New York; even if the aircraft carried no cargo on the Paris-New York leg, it could have carried cargo from Egypt to Paris and picked up a contaminant. Therefore, CBP must conduct AQI on the entire aircraft, not just the passengers and their luggage. *See* Agency Analysis of Proposed Rule at AR40 ("All commercial aircraft, including international air passenger carriers, air cargo carriers, and air courier carriers, are subject to inspection and the commercial aircraft user fee."); Agency Analysis of Final Rule at AR287 (same); Final Rule at AR236 ("All arriving international commercial flights are subject to the commercial airline clearance fee and inspection.").

For the foregoing reasons, the Court finds the statute unambiguously permits APHIS to charge both a "passenger fee" and a "commercial aircraft" fee for AQI services to inbound passenger airplanes. It need go no further in its *Chevron* analysis. *See Chevron*, 467 U.S. at 842-43. If, however, the statute were deemed ambiguous, the Court also finds that the interpretation used by APHIS is reasonable and permissible under *Chevron* Step 2.

### 2. *Grant Thornton's analysis and proposed fees – What constitutes a commercial aircraft?*

Plaintiffs argue further that even if two fees are permitted under the statute, the fees proposed by Grant Thornton, and adopted by APHIS, were calculated to charge a commercial aircraft fee only to cargo aircraft and not to passenger aircraft. By this reckoning, a commercial aircraft fee imposed on passenger aircraft is unnecessary to recoup costs and is therefore inconsistent with the statute and APA.

APHIS contracted with Grant Thornton to conduct a wholesale evaluation and review of the AQI fee program and to propose changes to the fee structure. The draft and final reports issued by Grant Thornton indicate that the accountants understood that passenger fees "should include the cost of related inspections of the aircraft or other vehicle." May 2012 Grant

Thornton Rep. at AR630. Grant Thornton also clearly recognized that the existing AQI fees had charged a "commercial aircraft" fee to both passenger and cargo aircraft. *See* March 2012 Grant Thornton Rep. at AR498 (chart identifying the pre-2015 fee scheme and indicating that the commercial aircraft fee was charged for inspection of passenger aircraft).

When Grant Thornton proposed decreasing the air passenger fee and increasing the commercial aircraft fee, its report appeared to indicate that the air passenger fee covered inspecting the entirety of an aircraft that carried passengers while the commercial aircraft fee was limited to cargo-only aircraft. *See* May 2012 Grant Thornton Rep. at AR638 (stating "revised air passenger fee includes the cost of inspecting passenger aircraft"); *id.* (stating the commercial aircraft fee "now applies only to cargo aircraft because the cost of inspecting passenger aircraft is included in the air passenger fee"); *see also* March 2012 Grant Thornton Rep. at AR501-502 (Grant Thornton proposals stated passenger aircraft inspection was included in passenger fee); *id.* at AR484 (Grant Thornton differentiating between passenger and cargo-only aircraft when assigning the costs of specific CBP activities to different users). Understandably, based on the language in Grant Thornton's report, Plaintiffs argue that the $225 commercial aircraft fee should only be charged to cargo aircraft.

APHIS agrees the language used by Grant Thornton may suggest that Grant Thornton intended the commercial aircraft fee to cover only cargo aircraft. However, APHIS delves into the data actually used by Grant Thornton, and published in the Federal Register, to show that the Grant Thornton calculation of the commercial aircraft fee included both passenger and cargo aircraft. In other words, whatever the drafter of the Grant Thornton report thought, the people with the green eyeshades who did the actual calculation of the "commercial aircraft" fee divided the total cost of aircraft inspections by 800,000+ inbound aircraft per year to determine

the commercial aircraft fee, that is, $225. The number of inbound flights per year used in this calculation necessarily was the estimate for the number of passenger and cargo aircraft *combined*, not merely cargo aircraft. *Compare* May 2012 Grant Thornton Rep. at AR638 (chart noting that Commercial Air (Cargo only) has a volume of 819,000, or over 800,000 aircraft) *with* March 2012 Grant Thornton Rep. at AR599-600 (listing the total number of commercial aircraft at just over 517,000 and total number of cargo aircraft at just under 140,000); *see also* Final Rule at AR237 (estimating in Table 4 the total number of commercial aircraft as 657,427 in FY10, 700,644 in FY11, and 719,251 in FY12). Because Grant Thornton used the projected total number of passenger *and* cargo aircraft to determine the per-aircraft fee, it is evident that the recommended fee was commensurate with the costs associated with inspections of all commercial aircraft despite contrary statements in the report.

Recognizing that the commercial aircraft fee of $225 was derived by dividing the total number of incoming passenger and cargo aircraft into the projected total inspection costs, APHIS reasonably determined that the fee should be charged to both. In reaching this conclusion, the Court finds that it is the agency's decisions in the Rule which ultimately govern, not the confusions in the consultant's report.

### 3. The Final Rule – Does APHIS adequately explain its rulemaking?

Plaintiffs next argue that even if the FACT Act permits APHIS to charge both a passenger fee and a commercial aircraft fee for AQI services, APHIS has acted arbitrarily and capriciously in adopting a commercial aircraft fee of $225 without proper explanation. Plaintiffs raise three specific issues: (1) APHIS sets passenger fees for cruise ship passengers to cover the entirety of its inspections of the ships, unlike air passenger fees; (2) it is unreasonable to divide AQI inspections of passenger aircraft between passengers and cargo; and (3) APHIS fails to address or explain why small and large passenger aircraft are treated differently. Plaintiffs

complain that APHIS failed to consider all relevant data and failed to establish a "rational connection between the facts found and the choice made." *Bowen*, 476 U.S. at 626; *see also Pub. Citizen*, 988 F.2d at 197 (stating that agencies must adequately explain the results of rulemaking).

> a. Are air passengers treated differently than sea passengers?

The 2015 Rule added a new fee for passengers entering the United States on a cruise ship and deleted the requirement that cruise ships pay the commercial vessel fee applicable to other ships. *See* Final Rule at AR230, AR238, AR250. APHIS tracked its authority to charge a specific fee to passengers on cruise ships to the FACT Act's inclusion of "international passengers" and explained that it derived from the unique nature of cruise ships, which are designed exclusively for passenger activities and not cargo. *See id.* at AR250. As a result, APHIS determined that the passenger fee for passengers on cruise ships should cover all costs associated with AQI inspections of passengers and the ship.

Plaintiffs argue that the same treatment should be extended to air passengers, so that air passengers pay the entire costs of inspecting passengers and aircraft. APHIS responds that the two passenger fees are similar because in both instances the cost of AQI services for passengers as a class includes the cost of related inspections of the aircraft or other vehicle. *See* Final Rule at AR 250 ("Based on our ABC analysis, we determined that the air passenger fee is not adequate to recover all the costs we incur in inspecting both passengers and aircraft, while the sea passenger fee is adequate to recover the costs we incur in inspecting both passengers and cruise ships."); *see also* Proposed Rule at AR10. However, in the case of aircraft, the costs of inspections related to the passengers' presence are not all of the AQI costs associated with a passenger aircraft (*see* discussion in section III.B.3.b). For cruise ships, on the other hand, the

sea passenger fee covers all inspections of the vessel itself because all of the inspections are deemed to be related to the presence of cruise passengers on the ship.

The Court finds that APHIS reasonably determined that cruise ships do not carry cargo so that all associated inspection costs are properly attributable to the passengers, while passenger aircraft may or may not carry cargo and, therefore, the cost of AQI related to the aircraft itself is not exclusively attributable to the passengers. APHIS explained its conclusions and did not act arbitrarily and capriciously by setting inspections fees for cruise passengers and air passengers as it did.

> b. Are the fees for passengers and commercial aircraft covering the same AQI inspections?

The Proposed Rule explains what inspections are covered by the air passenger fee and what is covered by the commercial aircraft fee to justify charging passenger aircraft both fees. Air passenger inspections include:

> prearrival analysis of incoming passengers and screening arriving air passengers for agricultural products by CBP Agriculture Specialists and CBP Officers; inspection of passenger baggage using CBP agriculture canines and specialized non-intrusive inspection equipment; inspecting the interior of the passenger aircraft; monitoring the storage and removal of regulated international garbage from the aircraft to ensure consistency with all regulatory requirements; safeguarding and appropriately disposing of any seized or abandoned prohibited agricultural products; and identifying pests found on prohibited agricultural products brought into the country by air passengers.

Proposed Rule at AR15; *see also* Agency Analysis of Proposed Rule at AR39 ("International air passenger inspections include the passengers, their baggage, and the passenger areas of the aircraft (e.g., ensuring garbage compliance)."). The commercial aircraft fee includes:

> reviewing manifests and documentation accompanying incoming cargo; targeting higher risk cargo for inspection or clearance; inspecting various types of agricultural and agricultural-related commodities, international mail, expedited courier packages,

> containers, compliant wood packaging material, and packing
> materials to screen for the presence of plant pests and contaminants,
> compliance with regulations, and determining entry status;
> inspecting the aircraft hold or exterior for contaminants, pests, or
> invasive species; monitoring the storage and removal of regulated
> international garbage from the aircraft to ensure consistency with all
> regulatory requirements; identifying pests found during inspection;
> and safeguarding shipments pending [Plant Protection and
> Quarantine] PPQ determination for treatment or final disposition.

Proposed Rule at AR15. These descriptions reasonably separate costs so that passengers pay only for searching passenger-related areas, such as the cabin and the baggage area, while the airline pays for inspections of other areas of the plane, such as the cargo and cargo hold and the exterior of the aircraft. The Final Rule directly addressed comments about the potential for duplicative fees: "We do not agree with the suggestion by the commenters that we are double charging or violating the FACT Act by imposing both an aircraft fee and an air passenger fee, since the respective fees cover different costs." Final Rule at AR250 (repeating the lists of separate costs for passenger and aircraft inspections included in the Proposed Rule and quoted above); *see also id*. at AR234 ("APHIS can include the cost of inspecting commercial aircraft that carry passengers in the international air passenger user fee if those costs directly relate to passenger baggage or regulated garbage. APHIS does not include the cost of inspecting cargo or the cargo hold area of the plane in the passenger fees. The commercial aircraft user fee pays the costs of inspecting the aircraft itself, cargo inspection, the cargo hold, and the costs of monitoring aircraft disinfection."); Agency Analysis of Final Rule at AR284-85 ("International air passenger inspections include the passengers, their baggage, and the passenger areas of the aircraft.");.

Plaintiffs challenge the agency's ability to divide inspection costs between passenger-related areas and the remainder of the aircraft, specifically noting the overlap between the "baggage area" and the "cargo hold." Despite Plaintiffs' argument that APHIS cannot

adequately separate the relevant costs, it is evident from Grant Thornton's analysis, the statements in the Final Rule, and APHIS's history of setting air passenger and commercial aircraft fees, that the agency has long set separate fees to cover the particular costs associated with each user class and that inspections related to passengers require different AQI services than inspections of aircraft. APHIS explained the difference as long ago as its 1992 Rulemaking when faced with a similar challenge, noting that:

> [p]assengers pose a different risk of bringing foreign diseases and pests into the United States than do the aircraft and cargo it carries. For example, passengers may have walked through dirt infested with parasites, or they may be carrying infested fruits or vegetables or infected meat on their person or in their baggage. Aircraft may be infested with a pest which has escaped from infested cargo. Aircraft or cargo may need to be fumigated or disinfected. Also, passengers are responsible for themselves and their baggage; the airline is responsible for the aircraft and the cargo. For all these reasons, passengers and their baggage must be inspected separately and in a different manner than the aircraft and its cargo.

57 Fed. Reg. 755, 763-64 (Jan. 9, 1992). In every rulemaking since 1992, APHIS has made the same distinctions in fees, by which it charged passengers for their related searches and charged the commercial aircraft fee for the remainder. Plaintiffs point to no specific flaws in Grant Thornton's ABC analysis and do not dispute the agency's long practice. The Court finds no reason to doubt the sufficiency of Grant Thornton's analysis or APHIS's explanation that different types of inspections are conducted for passenger-related costs and commercial aircraft costs. As indicated above, the differences are required by the statute and have been reasonably explained.

### c.  Is it reasonable for APHIS to treat small and large passenger aircraft differently?

Finally, Plaintiffs contend that APHIS acted in an arbitrary and capricious manner by treating small passenger aircraft differently from large passenger aircraft in the Rule and not

charging small aircraft the commercial aircraft fee unless they actually carry relevant materials. APHIS maintains that its treatment of small aircraft is consistent with other inspection regimes by the federal government and is reasonable. *See* Final Rule at AR236 ("APHIS maintains the 64-seat plane size distinction in harmony with CBP and other U.S. Government agencies with jurisdiction over civil aviation.").

"Under [7 C.F.R.] § 354.3(e)(2)(iv), all passenger aircraft originating in any country that have 64 or fewer seats and that do not carry certain regulated articles are exempt from paying the aircraft AQI user fee." *Id*. While the initial 1992 Rule included an exemption for aircraft with 30 seats or less, on March 17, 1993, APHIS expanded that exemption to aircraft with 64 or fewer seats, *see* 58 Fed. Reg. 14305, 14305 (March 17, 1993), recognizing that those aircraft "require little or no inspection." *Id*. However if a small aircraft is carrying "[f]resh fruits, fresh vegetables, plants, unprocessed plant products, cotton or covers, sugarcane, or fresh or processed meats," or offers a "meal service other than beverages and prepackaged snacks" that contains "meats derived from ruminants, swine, or poultry or fresh fruits and fresh vegetables," then a small aircraft will require AQI inspection and will be charged the commercial aircraft fee. 7 C.F.R. § 354.3(e)(2)(iv).

Plaintiffs argue that the same distinction can be applied to large passenger aircraft. However, Plaintiffs do not dispute that a large passenger aircraft might not have cargo when it arrives in the United States, but may have carried cargo on a prior leg of its trip and thereby contain contaminants. It is, therefore, not unreasonable for APHIS to require inspections unrelated to passengers for large passenger aircraft on all inbound flights but not all smaller aircraft.

APHIS contends that the exemption for small aircraft is consistent with the intent and instructions of the FACT Act to charge users only for the actual services they receive. Under this command, because small aircraft do not require the same AQI services as large aircraft, they are properly exempted from a mandatory inspection payment for all flights. Additionally, APHIS notes the complexity and administrative inconvenience of developing a range of commercial aircraft fees to distinguish between small and large aircraft, passenger and cargo aircraft, and passenger aircraft with or without cargo on a specific inbound leg; it argues such a regime would be unnecessarily burdensome and is not required by the FACT Act. *See* Final Rule at AR236 ("APHIS and CBP save resources and costs by not having to design a process for administering a complex fee structure. This helps to keep the fee costs to the payer as low as possible. . . . [I]t would be administratively burdensome to charge and audit a multitude of fees for the many different types of commercial aircraft and their cargo that enter the United States.").

The Court finds the continuation of APHIS's long-standing decision to exempt small passenger aircraft from automatic commercial airline inspection fees on all flights was fully detailed by APHIS and is not arbitrary or capricious or in violation of the FACT Act.

*4. Conclusion*

Despite some clear inconsistencies in understanding and the language used by Grant Thornton and APHIS itself in the Rule, the Court finds APHIS used Grant Thornton's ABC analysis (which combined passenger and cargo aircraft) to set fees commensurate to the costs associated with the air passenger user class and the commercial aircraft user class. Summary judgment will be granted in favor of APHIS on Count I.

### C. Reserve Account

Plaintiffs argue that APHIS violates the express language of the FACT Act by using a portion of the AQI fees to fund a "reserve account" since the authority to do so was expressly revoked by Congress after FY02. APHIS responds that the cited language, from the 1996 amendment to the FACT Act, did not revoke the agency's ability to fund a reserve after FY02, but only specified that the reserve was to be maintained in a Treasury account from FY96 to FY02 as APHIS transitioned from appropriated funding for AQI inspections to a fully self-supporting funding module, after which Agriculture would maintain the fund in its own accounts. APHIS also argues that if the Court finds the FACT Act ambiguous with respect its authority to fund a reserve account after FY02, it should defer to the agency's interpretation under *Chevron*. *See* 467 U.S. at 842-43.

As established in 1990, the FACT ACT stated:

> The Secretary shall adjust the amount of the fees to be assessed under this subsection to reflect the cost to the Secretary in administering such subsection, in carrying out the activities at ports in customs territory of the United States and preclearance and preinspection site outside the customs territory of the United States in connection with the provision of agricultural quarantine inspection services, and in maintaining a reasonable balance in the Account.

§ 2509(a)(4). The most recent relevant amendment to the FACT Act was enacted in 1996 and amended the fee authorization to state:

> (1) Fees authorized
>
> The Secretary of Agriculture may prescribe and collect fees sufficient—
>
> > (A) to cover the cost of providing agricultural quarantine and inspection services in connection with the arrival at a port in the customs territory of the United States, or the preclearance or preinspection at a site outside the customs territory of the United

States, of an international passenger, commercial vessel, commercial aircraft, commercial truck, or railroad car;

(B) to cover the cost of administering this subsection; and

(C) through fiscal year 2002, to maintain a reasonable balance in the Agricultural Quarantine Inspection User Fee Account established under paragraph (5).

21 U.S.C. § 136a(a). Paragraph (a)(5) described the account created at the Treasury:

(5) Agricultural Quarantine Inspection User Fee Account.

(A) Establishment. There is established in the Treasury of the United States a fund, to be known as the "Agricultural Quarantine Inspection User Fee Account", which shall contain all of the fees collected under this subsection and late payment penalties and interest charges collected under paragraph (4) through fiscal year 2002.

(B) Use of Account. For each of fiscal years 1996 through 2002, funds in the Agricultural Quarantine Inspection User Fee Account shall be available, in such amounts as are provided in advance in appropriations Acts, to cover the costs associated with the provision of agricultural quarantine and inspection services and the administration of this subsection. Amounts made available under this subparagraph shall be available until expended.

(C) Excess Fees. Fees and other amounts collected under this subsection in any of fiscal years 1996 through 2002 in excess of $100,000,000 shall be available for the purposes specified in subparagraph (B) until expended, without further appropriation.

*Id*. § 136a(a)(5). The pertinent question is whether the 1996 amendment prohibits APHIS from collecting fees to maintain a reasonable balance, or fund a reserve, after FY02.

*1. Where does APHIS base its authority to fund a reserve account?*

When APHIS first established the AQI user fees in 1991, it responded to comments questioning its authority to set fees to cover AQI service costs, administration costs, and a reserve fund. APHIS stated that it "included administrative costs and a reserve fund in [its] cost calculations" because the 1990 FACT ACT "provide[d] that [it] may recover the cost of administering the user fee program through the fees collected. . . . [and] also allowed for a

'reasonable' balance in the AQI user fee account."  56 Fed. Reg. 14837, 14841-42 (April 12, 1991).  Since the 1996 amendment and the inception of the AQI fee system, APHIS has based its authority to fund the reserve account on the language in the statute authorizing the Secretary to collect fees to maintain a reasonable balance.  In the current rulemaking, APHIS continued its reliance on the "reasonable balance" language located at § 136a(a)(1)(C).  *See* Final Rule at AR229 (stating that "user fees should recover the costs of: . . . [m]aintaining a reasonable balance, also referred to by APHIS as a 'reserve'").  Only during this litigation did APHIS concede that after 2002 the express statutory authority in § 136a(a)(1)(C) to fund a reserve account had expired; in its Supplementary Response, APHIS now justifies funding the reserve as part of the cost of "administering the user fee program" under § 136a(a)(1)(B).  Defs.' Supp. Resp. Pursuant to Court Order (Defs.' Suppl. Resp.) [Dkt. 32] at 2.

The APA requires an agency to provide its authority and reasoning during rulemaking and a court may only affirm a new rule based on the reasoning provided at the time.  *See Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006) ("[T]he grounds upon which the agency acted in exercising its powers [must be] those upon which its action can be sustained."); *see also SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943) ("We merely hold that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained.").  Based on the *Chenery* doctrine, APHIS's reserve fee may only be sustained if it is authorized by the "reasonable balance" language in § 136a(a)(1)(C), because that is the ground upon which APHIS relied in the rulemaking that set a fee amount for a reserve.  Therefore, the Court does not evaluate or rule on the agency's current argument that it has authority to fund a reserve under § 136a(a)(1)(B).

*2. Is the FACT Act language ambiguous?*

Since the original FACT Act in 1990, APHIS has had authority to collect fees to cover AQI services. The statute identified three categories of costs that the AQI fees were to cover: (1) administration of the subsection, (2) costs in carrying out the AQI activities, and (3) maintenance of a reasonable balance in the account. *See* § 2509. The phrase "maintain a reasonable balance" was understood to authorize APHIS to create a reserve fund. In 1996, the FACT Act was amended to create a true user fee account that was held by the Department of the Treasury until after FY02. The new amendment established a user fee account at Treasury until after FY02 and described how it was to be used:

> (B) Use of account. For each of fiscal years 1996 through 2002, funds in the Agricultural Quarantine Inspection User Fee Account shall be available, in such amounts as are provided in advance in appropriations Acts, to cover the costs associated with the provision of agricultural quarantine and inspection services and the administration of this subsection. Amounts made available under this subparagraph shall be available until expended.

21 U.S.C. § 136a(a)(5). At the end of FY02, the funds were to be transferred to the Department of Agriculture:

> After September 30, 2002, the unobligated balance in the Agricultural Quarantine Inspection User Fee Account and fees and other amounts collected under this subsection shall be created to the Department of Agriculture accounts that incur the costs associated with the provision of agricultural quarantine and inspection services and the administration of this subsection. The fees and other amounts shall remain available to the Secretary until expended without fiscal year limitation.

*Id*. § 136a(a)(6).

The 1996 amendment also changed the statute's language pertaining to fees the Secretary was authorized to collect. *Compare* § 2509(a)(4) ("maintaining a reasonable balance in the Account") *with* 21 U.S.C. § 136a(a)(1)(C) (permitting fees to be set "through fiscal year

2002, to maintain a reasonable balance in the Agricultural Quarantine Inspection User Fee Account established under paragraph (5)").

APHIS originally argued here that the time limit set in § 136a(a)(1)(C) was meant only to refer to the department that held the reserve account, *i.e.*, Treasury in FY96-FY02 and Agriculture after the transition period. Now, in its written response to a question posed at oral argument, APHIS concedes that the specific language in the 1996 amendment that referenced maintenance of a reasonable balance expired after FY02. *See* Defs.' Suppl. Resp. at 2 ("As part of [the 1996 amendment], the FACT Act removed the language in the statute that the Secretary 'shall adjust the amount of fees . . . to reflect the cost to the Secretary . . . in maintaining a reasonable balance in the' account."). The Court agrees that § 136a(a)(1)(C) does not give APHIS current authority to charge user classes to maintain a reserve account.

APHIS may set AQI fees to maintain a reasonable balance only if it provides a reasonable interpretation of the statute that provides that authority.[3] In the 2014-15 rulemaking, APHIS relied on the "reasonable balance" allowance in § 136a(a)(1)(C), but that expired after FY02. Whether there is authority to be found elsewhere, reliance on expired statutory language was unreasonable and therefore arbitrary and capricious. The Court will grant summary judgment to Plaintiffs on Count III and remand this part of the rulemaking for further consideration and possible rulemaking by APHIS.

---

[3] A March 2006 GAO Report did not expressly identify maintenance of a reasonable balance as an authorized fee. *See* March 2006 GAO Rep. at AR69981 ("The FACT Act authorizes user fees for (1) providing AQI services for the conveyances, cargo, and passengers listed above; (2) providing preclearance or preinspection at a site outside the customs territory of the United States to international airline passengers, commercial vessels, commercial trucks, commercial railroad cars, and commercial aircraft; and (3) administering the AQI user-fee programs.").

**D. Cross-Subsidization**

Plaintiffs also argue that the Rule expressly violates the FACT Act requirement that the fee charged must be commensurate with the costs of the services provided to each particular class of persons or vessels. In this challenge, Plaintiffs make two contentions. First, they argue that APHIS uses the fees charged to commercial passenger aircraft to cross-subsidize services provided to other classes of vessels. Plaintiffs specifically challenge the fact that some classes of vessels are charged no AQI fee, but still receive AQI services upon entering the United States (*i.e.* bus passengers, rail passengers, and private vehicles). Plaintiffs also contend that APHIS's maintenance of a single reserve fund leads to cross-subsidization and is a direct violation of the statute. APHIS responds that the Rule specifically addressed the issue of cross-subsidization and that the agency's use of the ABC methodology to determine the AQI fees was intended to avoid any class of users paying for inspections of another class. APHIS explains that the ABC methodology resulted in fees directly linked to the costs attributable to each user class and inspection of the users that are not charged AQI fees is funded exclusively through CBP appropriations. APHIS further argues that a single reserve account is appropriate as long as the reserve is funded through proportional contributions from each user class, which is why APHIS applies a 3% surcharge to each user class to fund the reserve.

The FACT Act requires the Secretary to "ensure that the amount of the fees is commensurate with the costs of agricultural quarantine and inspection services with respect to the class of persons or entities paying the fee." 21 U.S.C. § 136a(a)(2). The ABC method used by Grant Thornton and APHIS to set AQI fees in the 2015 rulemaking required linking expenses or costs borne by APHIS and CBP to each individual user class, regardless of whether a fee would ultimately be charged. For example, Grant Thornton attributed costs to rail and bus passengers, but an AQI fee was not ultimately assigned to those users. *See* May 2012 Grant

Thornton Rep. at AR642 ("Fees do not recover costs for other passenger classes (bus and rail). These costs would be covered by CBP's appropriation, as currently done."). Grant Thornton and APHIS explained that the goal in setting the AQI fee was to make it "commensurate with the costs with respect to the class of persons or entities paying the fees. This [was] intended to avoid cross-subsidization of AQI services." *Id*. at AR630; *see also* Proposed Rule at AR10. The AQI fees were not intended to cover every cost associated with inspections of all user classes, because APHIS recognized that some user classes are funded through CBP appropriations. *See* March 2013 GAO Rep. at AR70579 ("APHIS has chosen not to charge some classes of passengers, and the collections of the AQI program as a whole do not equal total identified program costs.").

Plaintiffs cite Kevin Shea, APHIS Administrator, who spoke at an AQI Stakeholder Webinar on January 13, 2015; Mr. Shea stated that APHIS was not going to promulgate an interim rule that would lower the air passenger fee from $5 to $4 because APHIS "could not operate this program if that revenue was immediately taken away." Stakeholder Webinar at AR194. Plaintiffs use this quote to argue that APHIS knew it was cross-subsidizing other user classes with the high fees from air passengers. The Court finds that Administer Shea's statement is somewhat ambiguous but could be read to admit that the pre-2015 fees resulted in cross-subsidization. However, such a conclusion does not imply or prove that there was an error in calculating AQI fees in the 2015 Rule. To the contrary, Administer Shea's comment can be understood as saying that a revision to the fee structure was necessary to bring the system into compliance with the requirement that fees be commensurate with the costs of inspection for each user class. Altering just the passenger fee, before bringing all fees to the new rates determined through ABC analysis, would logically lead to a shortfall in revenue.

The Court rejects Plaintiffs argument that APHIS improperly cross-subsidizes costs by using AQI fees from one user class to pay for inspections of users not charged AQI fees. It is clear from the record, and APHIS's repeated explanations during notice and comment, *see* Final Rule at AR229-31, 233, 238, that AQI fees were set using the ABC analysis and that services provided to those users not charged an AQI fee are funded through normal CBP appropriations.

Separately, Plaintiffs' argue that the way APHIS uses money in the reserve account violates the prohibition on cross-subsidization. Plaintiffs focus on § 136a(a)(6), which states that the fees should be stored in "Department of Agriculture accounts," and contend that the reference to multiple "accounts" requires APHIS to establish separate reserve accounts for each user class. APHIS rejects this analysis and notes that the proceeds of all fees were once lawfully held in a single consolidated account at Treasury, which indicates that Congress did not intend the "commensurate" requirement to extend to the ultimate use of reserve funds.

The FACT Act states that APHIS must ensure that the amount of the fees *charged* is commensurate with the costs of the particular user class, but does not specify that APHIS may only use fees collected from one user class on inspections of that user class. Section 136a(a)(2) of the Act instructs the Secretary on how to set the fees, not how to use the money once it has been acquired. *See* 21 U.S.C. § 136a(a)(2) ("In setting the fees under paragraph (1), the Secretary shall ensure that the amount of the fees is commensurate with the costs of agricultural quarantine and inspection services with respect to the class of persons or entities paying the fees."). GAO has commented on the flexibility provided to APHIS to use fees as it deemed necessary as long as they are set "commensurate with the costs of services with respect to a particular pathway." March 2013 GAO Rep. at AR70579 ("Once revenue is earned from one

pathway, however, it may be spent on any AQI-related program cost."). The 2015 rulemaking

clearly stated that fees were set separately for each user class. *See* Final Rule at AR229. The

reserve account is funded by a proportional percentage increase in the fee charged to all user

classes. *See id*. at AR234 ("To fund the reserve, the[] base fees are increased by 3.5 percent.").

Proportional funding is consistent with the commensurate requirement in the Act. The Court,

therefore, finds that APHIS's maintenance and use of the reserve fund as a single account does

not violate the FACT Act and will grant summary judgment in favor of the agency on Count II.

### E. Lack of Meaningful Opportunity to Comment

Finally, Plaintiffs challenge the procedures of the 2015 rulemaking, alleging that

APHIS failed to disclose the data underlying its decisions to alter the AQI fees until after the

Rule was issued, and that APHIS relied on unreliable data in setting the fees in the 2015 Rule.

#### 1. Did APHIS Fail to Provide the Underlying Data?

Plaintiffs argue that by failing to provide the data upon which Grant Thornton

relied in its fee model, APHIS "prevented stakeholders and the public from evaluating the

agency's fee-setting process" and providing meaningful comments on the results. Pls.' Mot. at

36-37. APHIS counters that Plaintiffs raised all of the same complaints and concerns in their

comments to the proposed rule, when the underlying data was not available, as they do in this

litigation, when the underlying data is available. Therefore, it contends, Plaintiffs were not

deprived of a meaningful opportunity to comment and APHIS did not violate the APA.

The APA requires an agency to provide the public with a meaningful opportunity

to comment on a proposed rule and "offer reasoned responses to significant comments." *Shands

Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 261 (D.D.C. 2015); *see also Dist. Hosp.

Partners, L.P. v. Burwell*, 786 F.3d 46, 56-57 (D.C. Cir. 2015). An agency is also required to

"examine the relevant data and articulate a satisfactory explanation for its action." *Dist. Hosp.*

*Partners*, 786 F.3d at 56-57. In order to satisfy the requirement that the public be provided a meaningful opportunity to comment, an agency must "identify and make available technical studies and data that it has employed" in developing a proposed rule. *Connecticut Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530 (D.C. Cir. 1982); *see also Time Warner Entm't Co. v. FCC*, 240 F.3d 1126, 1140 (D.C. Cir. 2001) ("[A]n agency cannot rest a rule on data that, in critical degree, is known only to the agency.").

APHIS and Grant Thornton explained the process for determining the relevant fees for each user fee as ABC.

> ABC uses a two-step methodology to assign an organization's costs to its work activities and then to its related outputs. . . .
>
> In the first step of ABC, we assigned costs to activities using resource drivers, which typically represent a cause-and-effect relationship to establish how much of a resource is consumed by each activity. . . .
>
> In the second step, we assigned APHIS and CBP activity costs to the outputs produced by performing the activities.

Proposed Rule at AR12. Plaintiffs (and other commenters) complained that "because the cost data provided by APHIS did not provide specifics regarding the calculation of the individual user class fees, the validity of the cost calculations overall is questionable" and "the lack of transparency unfairly inhibits [the] industry's ability to respond knowledgeably" to the proposed rule. Final Rule at AR230. In response to such comments, APHIS provided a website link where applicable data was located and provided more cost information by user class in the text of the final rule. *See id*. Plaintiffs argue, however, that the data provided with the proposed rule and at the website did not include the lengthier report drafted by Grant Thornton on March 30, 2012, *see* March 2012 Grant Thornton Rep. at AR432-AR624, or the User Fee Modeling Data

utilized by Grant Thornton to conduct the ABC analysis. *See* User Fee Modeling Data at AR656-AR69963.

It is undisputed that the March 2012 Grant Thornton Report and User Fee Modeling Data were not provided to the public during the rulemaking, however, Plaintiffs have failed to demonstrate harm from that fact. APHIS argues, and the Court agrees, that Plaintiffs have not raised significantly different arguments or objections to the Rule after acquiring the data, therefore nullifying any argument that they were deprived of a meaningful opportunity to comment during the rulemaking period. Additionally, the only harm Plaintiffs identified at oral argument was the harm of being subject to an AQI fee that they believed was improper under the statute, but that harm is not particular to the data issue and is fully addressed by the arguments above which challenge numerous alleged infirmities in the Rule. The Court finds that although some data was not publicized during rulemaking, Plaintiffs have not shown any way in which they were prevented from engaging in meaningful notice and comment or would have changed their position during the rulemaking.

### 2. *Was the data used to determine fees fatally flawed?*

Plaintiffs also take issue with the data used by Grant Thornton and APHIS to determine AQI fees, arguing (1) the accountants improperly relied on a single year's data and (2) the workload and labor data were highly unreliable. APHIS responds that an agency's judgment about what data to use should receive an extreme degree of deference because agencies are "afforded wide latitude to determine whether particular data may be relied upon." APHIS Opp'n at 39. In responding to Plaintiffs' specific arguments, APHIS states that (1) data from FY10 and FY11 were used to set the revised AQI fees, and (2) APHIS acted reasonably in relying on the workload and labor data available to it.

Agencies must often conduct analyses with imperfect data and can only be expected to do the best they can with the information available to them. *See, e.g., Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52 ("It is not infrequent that the available data do not settle a regulatory issue and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion."); *Natural Res. Def. Council, Inc. v. EPA*, 529 F.3d 1077, 1085 (D.C. Cir. 2008) (describing the agency's efforts to evaluate health risks caused by certain industrial chemicals despite "gaps in the data" by backfilling certain data points with "environmentally protective defaults"). The Court recognizes that an agency cannot be faulted for using the data available to it to the best of its ability, but must evaluate why limited data was available.

The lack of adequate record-keeping by CBP has been thoroughly documented by GAO and the DHS OIG and is not in dispute. *See* March 2006 GAO Rep. at AR69965 (noting that "because of weaknesses in the design of CBP's new financial management system, CBP was unable to provide APHIS with information on the actual costs of the AQI program by user-fee type—for example, fees paid by international air passengers"); *id*. at AR69999 ("Although CBP provided detailed cost information by activity and user-fee type to APHIS for fiscal year 2004, CBP provided only estimated cost information for fiscal year 2005 because of a weakness in the design of the agency's new financial management system."); Feb 2007 OIG Report at AR70745 (indicating the data system used to track agricultural inspection activities "continues to be a problem at CBP"); Feb 2008 GAO Rep. at AR70129 ("In the case of the AQI, customs, and immigration vessel and sea passenger fees, the agencies and Congress lack information on the total costs of the combined inspections, and therefore do not know whether fee collections cover the costs of the consolidated inspection program."); Sept 2012 GAO Rep. at AR70278-80

(indicating that, although improvement had been made to the data collection system, CBP still had issues with accurate data collection, including with data input inconsistencies between ports and lack of adequate review by managers); *id*. at AR70290 ("[T]he agencies may not have sufficient information on which to base key decisions to support the AQI program because the data the two agencies are collecting and using for managing the program may not be reliable."); March 2013 GAO Rep. at AR70578 (stating "data quality is an ongoing issue with AQI data systems"); *id*. at AR70580 ("CBP does not capture all time spent on agriculture activities in its Cost Management Information System (CMIS)—the system in which CBP tracks its activities and determines personnel costs. Both to accurately set AQI fee rates to recover program costs and to allocate fee revenues between APHIS and CBP proportionate with each agency's program costs, CBP must accurately track its expenses related to the AQI program."); *id*. at AR70581 ("[A]t 31 ports and other locations, CBP did not charge any primary inspection time to agriculture-related CMIS codes for all or a portion of fiscal year 2012, which means that AQI costs at these ports are being understated.").

Although CBP continues to suffer from data challenges in tracking AQI services by user class, improvements have been made since the original GAO report in March 2006, and CBP continues to work to implement an adequate system to track inspection costs. In September 2012 the GAO reported on improvements to CBP's data system and noted that:

> CBP added agriculture-specific activity codes to its financial management system, which, according to CBP officials, allows CBP to provide APHIS with actual costs related to user fees. In addition, CBP issued guidance to clarify how employees should account for activities that are simultaneously related to immigration, customs, and agriculture activities so that this information could be tracked for the purpose of collecting AQI user fees. According to APHIS and CBP officials, the new activity codes and guidance allow CBP to accurately report its costs by user fee type to APHIS and ensure financial accountability for funds allocated to AQI user fees.

Sept 2012 GAO Rep. at AR70267-68. GAO also noted that, despite the continuing issues with data collection, CBP and APHIS must use the data available to set user fees. *See* March 2013 GAO Rep. at AR70578 ("Office of Management and Budget Circular A-25 states that when reviewing user fees, full cost should be determined or estimated using the best available records of the agency, and new cost accounting systems do not need to be established solely for the purpose of rate-setting. The contractor also solicited input from stakeholders as part of the fee review process, a practice consistent with our User Fee Design Guide.").

Regardless of any continued inadequacies in the CBP data for different types of AQI inspections, APHIS was required to set fees commensurate with the costs associated with providing AQI services to each user class. To satisfy that requirement, APHIS enlisted Grant Thornton to conduct an activity-based costing analysis using the best data it had available, data from FY10 and FY11. Although Plaintiffs argue that the data was insufficient and should not have been used to calculate the fees, they offer no alternative and provide no reason to believe data from other fiscal years would have been more reliable. The Court finds that APHIS used its judgment to determine that data from FY10 and FY11 were the best available and sufficient to calculate AQI fees and that judgment should be given significant deference. *See* Final Rule at AR241-42 ("APHIS and CBP identified the correct data to use in the model and eliminated the identified inconsistencies. Issues such as these in a very large operation are continuous in nature as the activities change, new systems become available, priorities change, or new demands for information arise. The data is relevant and it is part of official government systems. APHIS and CBP are continually working together to enhance data collection."); *see also* Oct. 2011 Grant Thornton Rep. at AR421 ("The workload (output) data received from both agencies is considered

to be reasonably accurate."). For the foregoing reason, the Court will grant summary judgment to the agency on Count IV.

## IV. CONCLUSION

For the foregoing reasons, the Court will deny Defendants' motion to dismiss, grant summary judgment to Defendants on Counts One I, II, and IV, and grant summary judgment in favor of Plaintiffs on Count III. Rulemaking will be remanded to APHIS for reconsideration of its authority to charge a surcharge for a reserve account. A memorializing Order accompanies this Opinion.

Date: March 28, 2018

_____/s/_____

ROSEMARY M. COLLYER
United States District Judge