UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                        )
AIR TRANSPORT ASSOCIATION               )
OF AMERICA, INC., et al.,               )
                                        )
            Plaintiffs,                 )
                                        )
      v.                                )        Civil Action No. 16-0919 (PLF)
                                        )
UNITED STATES DEPARTMENT                )
OF AGRICULTURE, et al.,                 )
                                        )
            Defendants.                 )
_____)
```

OPINION

This case involves a challenge to a final interpretive rule issued by the Animal and Plant Health Inspection Service concerning its provision of Agricultural, Quarantine, and Inspection services.  Plaintiffs Air Transport Association of America, Inc., and International Air Transport Association (collectively, "plaintiffs") brought suit challenging the final interpretive rule.  Before the Court are plaintiffs' motion for summary judgment challenging the final interpretive rule, and defendants' cross-motion for summary judgment defending the rule.[1] Upon careful consideration of the parties' filings, the relevant legal authorities, the arguments of counsel at the January 25, 2021 motions hearing, and the entire record in this case, the Court will

---

[1]     Defendants are the United States Department of Agriculture, the United States Department of Homeland Security, United States Customs and Border Protection, and the Animal and Plant Health Inspection Service.  Because the challenged rule was issued by the Animal and Plant Health Inspection Service, this opinion will refer to defendants collectively as "APHIS."

grant defendants' motion for summary judgment and deny plaintiffs' motion for summary judgment.[2]

## I.   BACKGROUND

This case concerns a rulemaking by the Animal and Plant Health Inspection Service ("APHIS" or "the agency"), a federal agency within the United States Department of Agriculture ("USDA").[3]   APHIS is tasked with "ensuring the free flow of agricultural trade by keeping U.S. agricultural industries free from pests and diseases."  Imports & Exports, U.S. DEP'T OF AGRIC. ANIMAL & PLANT HEALTH INSPECTION SERV. (Oct. 20, 2015), https://www.aphis.usda.gov/aphis/ourfocus/importexport.  APHIS carries out this work, in part, through the Agricultural Quarantine Inspection ("AQI") program.  See Air Transport Ass'n of Am., Inc. v. U.S. Dep't of Agriculture ("Air Transport I"), 303 F. Supp. 3d 28, 33 (D.D.C. 2018).  Through the AQI program, APHIS – along with Customs and Border Protection – inspects persons and vessels entering the United States for "possible infection or

---

[2]   The Court has reviewed the following documents and accompanying exhibits in connection with the pending motion:  Complaint ("Compl.") [Dkt. No. 1]; Amended Complaint ("Am. Compl.") [Dkt. No. 54]; Plaintiffs' Motion for Summary Judgment ("Pl. MSJ") [Dkt. No. 61]; Plaintiffs' Memorandum in Support of their Motion for Summary Judgment ("Pl. Mem.") [Dkt. No. 61-1]; Defendants' Motion for Summary Judgment ("Def. MSJ") [Dkt. No. 63]; Memorandum in Support of Defendants' Motion for Summary Judgment ("Def. Mem.") [Dkt. No. 64];  Plaintiffs' Reply in Support of its Motion for Summary Judgment and Opposition to Defendant's Motion for Summary Judgment ("Pl. Reply and Opp.") [Dkt. No. 65]; and Defendants' Reply in Support of its Motion for Summary Judgment ("Def. Reply") [Dkt. No. 67].

[3]   This case originally was assigned to Judge Rosemary Collyer, and it was reassigned to this Court on March 26, 2020, following Judge Collyer's retirement.  An opinion issued by Judge Collyer in 2018 provides a detailed factual history of this case, including a review of much of the relevant regulatory history.  See Air Transport Ass'n of Am., Inc. v. U.S. Dep't of Agriculture, 303 F. Supp. 3d 28, 33-38 (D.D.C. 2018).

infestation with pests and diseases that threaten the resident flora and fauna." Id. (citations omitted).

### A. Statutory History

The AQI program was originally funded exclusively by annual appropriations to the USDA. Air Transport I, 303 F. Supp. 3d at 34. In 1990, however, Congress enacted the Food, Agricultural, Conservation and Trade Act ("FACT Act") of 1990, Pub. L. No. 101-624, § 2509, 104 Stat. 3359, 4069-70 (1990) (current version at 21 U.S.C. § 136a (2020)). As originally enacted, the FACT Act read:

> The Secretary of Agriculture . . . may prescribe and collect fees to cover the cost of providing agricultural quarantine and inspection services in connection with the arrival at a port in the customs territory of the United States, or the preclearance or preinspection at a site outside the customs territory of the United States, of a commercial vessel, commercial aircraft, commercial truck, or railroad car.

§ 2509(a)(1), 104 Stat. at 4069. It further required the Secretary of Agriculture to set and adjust the fees:

> to reflect the cost to the Secretary in administering such subsection, in carrying out the activities at ports in customs territory of the United States and preclearance and preinspection sites outside the customs territory of the United States in connection with the provision of agricultural quarantine inspection services, and in maintaining a reasonable balance in the Account.

§ 2509(a)(4), 104 Stat. at 4070. These provisions authorized APHIS to collect user fees to fund the AQI program, Air Transport I, 303 F. Supp. 3d at 34, and required that the fees be set to reflect current costs.

Since it first began setting inspection fees in 1991, APHIS has indicated that AQI user fees would cover a variety of costs, including delivery costs, program support costs, and the cost to maintain a reserve fund. See Air Transport I, 303 F. Supp. 3d at 35. The reserve fund

was "designed to cover three months' average operating costs for the AQI program."  Id.

Although the AQI program had transitioned to a user-fee program with the enactment of the

FACT Act, this three-month reserve was necessary because those user fees were only remitted to

the USDA on a quarterly basis, subject to the congressional appropriations process.  H.R. REP.

NO. 104-462, at 54.  Without the reserve, the agency would be unprepared "to handle

emergencies or unexpected volumes."  Air Transport I, 303 F. Supp. 3d at 35.

The FACT Act has been amended several times, including as part of the Federal

Agricultural Improvement and Reform Act of 1996, Pub. L. No. 104-127 § 917, 110

Stat. 888, 1187-88.  The purpose of the 1996 amendment was to transition the AQI program

from being funded by an account subject to congressional appropriations to being funded by a

true user-fee system.  See Air Transport I, 303 F. Supp. 3d at 51; see also Pl. Mem. at 6; Def.

Mem. at 6.  As amended, the FACT Act created a temporary AQI User Fee Account in the

Treasury Department:

> (5) Agricultural Quarantine Inspection User Fee Account
>
> (A)  Establishment.  There is established in the Treasury of the United States a fund, to be known as the "Agricultural Quarantine Inspection User Fee Account", which shall contain all of the fees collected under this subsection and late payment penalties and interest charges collected under paragraph (4) through fiscal year 2002.
>
> (B)  Use of account.  For each of fiscal years 1996 through 2002, funds in the Agricultural Quarantine Inspection User Fee Account shall be available, in such amounts as are provided in advance in appropriations Acts, to cover the costs associated with the provision of agricultural quarantine and inspection services and the administration of this subsection.  Amounts made available under this subparagraph shall be available until expended.
>
> (C)  Excess fees.  Fees and other amounts collected under this subsection in any of fiscal years 1996 through 2002 in

> excess of $100,000,000 shall be available for the purposes specified in subparagraph (B) until expended, without further appropriation.

21 U.S.C. § 136a(a)(5).  The amended act further stated that

> [a]fter September 30, 2002, the unobligated balance in the Agricultural Quarantine Inspection User Fee Account and fees and other amounts collected under this subsection shall be credited to the Department of Agriculture accounts that incur the costs associated with the provision of agricultural quarantine and inspection services and the administration of this subsection. The fees and other amounts shall remain available to the Secretary until expended without fiscal year limitation.

21 U.S.C. §136a(a)(6).

In addition to creating this temporary account to hold AQI fees, the 1996

amendment revised the section describing the purposes for which fees may be collected.  See Air

Transport I, 303 F. Supp. 3d at 35.  The Act now states:

> The Secretary of Agriculture may prescribe and collect fees sufficient—
>
> (A)  to cover the cost of providing agricultural quarantine and inspection services in connection with the arrival at a port in the customs territory of the United States, or the preclearance or preinspection at a site outside the customs territory of the United States, of an international passenger, commercial vessel, commercial aircraft, commercial truck, or railroad car;
>
> (B)  to cover the cost of administering this subsection; and
>
> (C)  through fiscal year 2002, to maintain a reasonable balance in the Agricultural Quarantine Inspection User Fee Account established under [21 U.S.C. § 136a(a)(5)].

21 U.S.C. § 136a(a)(1).  This authority to collect fees is limited by the next subsection, which

states that in setting fees, "the Secretary shall ensure that the amount of the fees is commensurate

with the costs of agricultural quarantine and inspection services with respect to the class of

persons or entities paying the fees.  The costs of the services with respect to passengers as a class includes the costs of related inspections of the aircraft or other vehicle."  Id. at § 136a(a)(2).[4]

## B.  Procedural History

In 2012, APHIS determined that the user fees it had been charging were inadequate to meet the costs of providing AQI services.  Air Transport I, 303 F. Supp. 3d at 37. It therefore retained Grant Thornton LLP, an international audit, tax, and advisory firm, to "conduct a comprehensive fee review to determine the full cost of AQI services, identify potential changes to the fee structure, and recommend new fees."  Grant Thornton, AQI FEE SCHEDULE ASSESSMENT AND ALTERNATIVES (May 21, 2012), at AR629.[5]  Based in part on Grant Thornton's calculations, APHIS adopted a final rule in 2015 that set new AQI fees of $3.96 (reduced from $5) per passenger and $225 (increased from $70.75) per international commercial aircraft.  Air Transport I, 303 F. Supp. 3d at 37.  According to APHIS, the fees were intended, in part, to cover the cost of maintaining a reserve.  See User Fees for Agricultural Quarantine and Inspection Services, 79 Fed. Reg. 22,895, 22,898 (Apr. 25, 2014) (to be codified at 7 C.F.R. pt. 354).

In 2016, plaintiffs filed a complaint in this Court seeking declaratory and injunctive relief and alleging four violations of the Administrative Procedure Act ("APA"):

> Count I: The Rule violates the FACT Act's prohibition against duplicative commercial aircraft fees.
>
> Count II: The Rule violates the FACT Act's prohibition on cross-subsidization of fees among user classes.

---

[4]     Although the FACT Act has been amended since 1996, those amendments did not alter any of the foregoing provisions.

[5]     The Administrative Record for the 2014-15 rulemaking is located at Docket Numbers 30 and 31.

> Count III: The Rule maintains a reserve, in violation of the FACT Act's removal of APHIS's authority to maintain a reserve after 2002.
>
> Count IV: The Rule was adopted without reasoned decision-making due to unreliable data and data which was withheld from commenters.

Air Transport I, 303 F. Supp. 3d at 37 (citing Compl. at 36, 37, 39, 40). The case was assigned to Judge Rosemary Collyer. The parties filed cross-motions for summary judgment, and after hearing oral argument, Judge Collyer granted summary judgment for APHIS on Counts I, II, and IV and summary judgment for plaintiffs on Count III. Air Transport I, 303 F. Supp. 3d at 33. With respect to Count III, Judge Collyer remanded to the agency.

Count III concerned APHIS's authority to maintain an AQI reserve after 2002. During litigation, APHIS first argued that a reserve was only authorized by subsection (1)(C) of the FACT Act. After being pressed on this point, however, APHIS abandoned its reliance on subsection (1)(C) and instead sought to "justif[y] funding the reserve as part of the cost of 'administering the user fee program' under § 136a(a)(1)(B)." Air Transport I, 303 F. Supp. 3d at 50. Judge Collyer declined to consider that argument: "The APA requires an agency to provide its authority and reasoning during rulemaking and a court may only affirm a new rule based on the reasoning it provided at the time." Id. at 50-51. Judge Collyer held that during the 2015 rulemaking, APHIS had "reli[ed] on the 'reasonable balance' language located at § 136a(a)(1)(C)" of the FACT Act to justify maintaining the reserve. Id. at 50. Her analysis therefore focused on whether subsection (1)(C) authorized APHIS to maintain a reserve. She concluded that "[Section] 136a(a)(1)(C) does not give APHIS current authority to charge user classes to maintain a reserve account" because the "reasonable balance" language of the subsection expired after fiscal year 2002. Id. at 52. She therefore granted summary judgment to

plaintiffs on Count III and remanded that part of the rulemaking "to APHIS for reconsideration of its [statutory] authority to charge a surcharge for a reserve account." Id. at 57.

Plaintiff then filed a motion asking Judge Collyer to amend her order and vacate – not simply remand – the portion of the 2015 rule concerning APHIS's authority to fund a reserve account. They argued that APHIS's reliance on expired statutory authority to justify the reserve was a "fundamental procedural flaw." Air Transport Ass'n of Am., Inc. v. U.S. Dep't of Agriculture ("Air Transport II"), 317 F. Supp. 3d 385, 391 (D.D.C. 2018). Judge Collyer denied plaintiffs' motion to vacate. Id. at 392. She concluded that although APHIS had "acted unreasonably" by relying on expired statutory authority, that deficiency did not "rise to the level of a 'fundamental flaw'" in the rule that "APHIS would have 'little or no prospect' of curing." Id. at 391-92 (internal quotations omitted) (quoting Heartland Reg'l Med. Ctr. v. Sebelius, 566 F.3d 193, 197 (D.C. Cir. 2009)). She found that the representation by APHIS "that there is a 'significant possibility' that it will be able to explain its authority to collect a reserve fee on remand" was "sufficient for the Court to remand for further rulemaking without vacatur." Id. at 392 (quoting Williston Basin Interstate Pipeline Co. v. FERC, 519 F.3d 497, 504 (D.C. Cir. 2008)).

On remand, APHIS published a proposed interpretive rule. See User Fees for Agricultural Quarantine and Inspection Services, 84 Fed. Reg. 17,729 (proposed Apr. 26, 2019) (to be codified at 7 C.F.R. pt. 543) ("2019 Proposed Rule"). The proposed interpretive rule stated "that subsections 136a(a)(1)(A) and (B) of the FACT Act provide adequate authority to continue setting user fees in amounts to maintain the AQI reserve." Id. at 17,730. It further stated that APHIS "construe[s] these sections as providing authority to continue funding a reserve in order to ensure continuity of services as well as to protect the program from instability

resulting from flow uncertainty, bad debt, and non-recurring financial obligations."  Id.
at 17,731.  In other words, the agency reasoned in its proposed rule that a reserve is necessary to
cover the cost of "providing agricultural quarantine and inspection services," 21 U.S.C.
§ 136a(a)(1)(A), and "administering this subsection," 21 U.S.C. § 136a(a)(1)(B).  In the
proposed interpretive rule, APHIS briefly reviewed its history of rulemaking since 2002 and
explained that the agency had a "longstanding practice" of relying on subsections (1)(A) and
(1)(B) to justify the reserve.  2019 Proposed Rule, 84 Fed. Reg. at 17,730-31.

On January 16, 2020, APHIS published a final interpretive rule reiterating the
reasoning set forth in the proposed interpretive rule.  See User Fees for Agricultural Quarantine
and Inspection Services, 85 Fed. Reg. 2,621 (Jan. 16, 2020) (to be codified at 7 C.F.R. pt. 354)
("2020 Final Rule").  Plaintiffs subsequently filed an amended complaint with a revised
Count III alleging that the 2020 Final Rule "fails to provide a reasonable interpretation of the
FACT Act that authorizes it to set AQI fees to maintain a reasonable balance in the reserve."
Am. Compl. ¶ 123.  After APHIS answered, plaintiffs moved for summary judgment on
Count III, and APHIS filed an opposition and cross-motion for summary judgment.  See Pl. MSJ;
Def. MSJ.

## II.  LEGAL STANDARDS

### A.  Summary Judgment

"[W]hen a party seeks review of agency action under the APA, the district judge
sits as an appellate tribunal."  Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C.
Cir. 2001).  The function of the district court is "to determine whether or not as a matter of law
the evidence in the administrative record permitted the agency to make the decision it did."  Air
Transport I, 303 F. Supp. 3d at 38.  "The standard for granting summary judgment set forth in

Rule 56 of the Federal Rules of Civil Procedure – whether there are genuine issues of material

fact that preclude judgment for one side or the other – therefore does not apply to a review of

agency action." Mashpee Wampanoag Tribe v. Bernhardt, 466 F. Supp. 3d 199, 213

(D.D.C. 2020). "Summary judgment nonetheless 'serves as the mechanism for deciding, as a

matter of law, whether the agency action is supported by the administrative record and otherwise

consistent with the APA standard of review.'" Id. (quoting Sierra Club v. Mainella, 459 F.

Supp. 2d 76, 90 (D.D.C. 2006)). Judicial review is limited to the information in the

administrative record. Id.

### B. *Chevron* Framework

When a party challenges agency action as inconsistent with the terms of a statute,

courts must conduct the familiar two-step Chevron analysis. In step one, the court must

determine "whether Congress has directly spoken to the precise question at issue" or, instead,

whether the statute is ambiguous. Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.

("Chevron v. NRDC"), 467 U.S. 837, 842 (1984). In determining whether Congress has directly

spoken to the precise question at issue, the Court uses the "traditional tools of statutory

construction," including an examination of the statute's text, the structure of the statute, and (as

appropriate) legislative history. Id. at 843 n.9; see also Air Transp. Ass'n of Am., Inc, v. Nat'l

Mediation Bd., 719 F. Supp. 2d 26, 31 (D.D.C. 2010). "If the intent of Congress is clear, that is

the end of the matter; for the court, as well as the agency, must give effect to the unambiguously

expressed intent of Congress." Meredith v. Fed. Mine Safety & Health Rev. Comm'n, 177

F.3d 1042, 1053 (D.C. Cir.1999) (internal quotations omitted). If the court determines that the

"statute is silent or ambiguous with respect to the specific issue" – that is, if the disputed

language is "reasonably susceptible to different interpretations" – it must proceed to step two.

Chevron v. NRDC, 467 U.S. at 843; Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co., 470 U.S. 451, 473 n.27 (1985).

At step two, "the question for the court is whether the agency's [action] is based on a permissible construction of the statute." Chevron v. NRDC, 467 U.S. at 843.  In the D.C. Circuit, this inquiry is "similar to (but conceptually distinct from) the standard arbitrary and capricious style analysis." Air Transp. Ass'n. of Am., Inc. v. Nat'l Mediation Bd., 719 F. Supp. 2d at 31 (internal quotations omitted) (citing Cont'l Air Lines, Inc. v. Dep't of Transp., 843 F.2d 1444, 1452 (D.C. Cir. 1988)).  Thus, a "'reasonable' explanation of how an agency's interpretation serves the statute's objectives is the stuff of which a 'permissible' construction is made . . .; an explanation that is 'arbitrary, capricious, or manifestly contrary to the statute,' however, is not." Northpoint Tech. Ltd. v. FCC, 412 F.3d 145, 151 (D.C. Cir. 2005) (quoting Chevron v. NRDC, 467 U.S. at 844).  "'Reasonableness' in this context means . . . the compatibility of the agency's interpretation with the policy goals . . . or objectives of Congress." Cont'l Air Lines Inc. v. Dep't of Transp., 843 F.2d at 1452.  "[T]he critical point is whether the agency has advanced what the Chevron Court called 'a reasonable explanation for its conclusion that the regulations serve the . . . objectives [in question].'" Id.; see also 1 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 3.6 at 172-73 (4th ed. 2002) (stating that under Chevron step two, courts must determine, among other things, "whether the agency adequately discussed the relationship between the interpretation and pursuit of the goals of the statute").

A court's review at the second step is "highly deferential." Nat'l Rifle Ass'n of Am. v. Reno, 216 F.3d 122, 137 (D.C. Cir. 2000).  An agency need not establish that its construction of the statute is "the best interpretation of the statute," United States v. Haggar Apparel Co., 526 U.S. 380, 394 (1999), or that it is "the only [construction that the agency]

permissibly could have adopted," Rust v. Sullivan, 500 U.S. 173, 184 (1991).  Instead, courts

defer to an agency's construction "if it is reasonable and consistent with the statutory purpose

and legislative history," Bell Atl. Tel. Cos. v. FCC, 131 F.3d 1044, 1049 (D.C. Cir. 1997), even

if "it is not the [construction the court] would arrive at," Dep't of Treasury, I.R.S. v. FLRA, 494

U.S. 922, 928 (1990).  The agency's "view need be only reasonable to warrant deference."

Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702 (1991).

### C.  Administrative Procedure Act

The APA requires courts to "hold unlawful and set aside agency action, findings,

and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right," 5 U.S.C. § 706(2)(C).  An agency action is arbitrary and

capricious if the agency failed to "examine[] the relevant data and articulate a satisfactory

explanation for its action including a 'rational connection between the facts founds and the

choice made.'"  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463

U.S. 29, 43 (1983) (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168

(1962)).  Agency action is also arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it
> to consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs counter to
> the evidence before the agency, or is so implausible that it could not
> be ascribed to a difference in view or the product of agency
> expertise.

Id.  But "[j]ust as the Court may not 'substitute [its] judgment for that of the agency' to set aside

an agency action, it also may not 'affirm an agency decision on a ground other than that relied

upon by the agency.'"  Mashpee Wampanoag Tribe v. Bernhardt, 466 F. Supp. 3d at 214 (citations

omitted).

The agency may change its policy or position, but when it does so, the agency must "provide reasoned explanation for its action," FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009), and "must show that there are good reasons for the new policy," id. Those reasons need not be "more substantial than those required to adopt a policy in the first instance." Id. at 514. Instead, a court will approve of a new policy if the agency can show "that the new policy is permissible under the statute . . . and that the agency *believes* it to be better, which the conscious change of course adequately indicates." Id. at 515. A reasoned explanation also requires the agency to "display awareness that it *is* changing position." Id. "An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." Id. (citing United States v. Nixon, 418 U.S. 683, 696 (1974)). The Supreme Court has made clear that when an agency action changes prior policy, the APA does not require the agency to meet a heightened standard. FCC v. Fox Television Stations, Inc., 556 U.S. at 515.

This "requirement that an agency adequately explain its result 'is not particularly demanding' and 'nothing more than a brief statement is necessary.'" Mashpee Wampanoag Tribe v. Bernhardt, 466 F. Supp. 3d 199, 214 (D.D.C. 2020) (quoting Muwekma Ohlone Tribe v. Salazar, 813 F. Supp. 2d 170, 190 (D.D.C. 2011)).

## III. DISCUSSION

Plaintiffs argue that the 2020 Final Rule is unlawful because (1) the asserted statutory bases for the interpretation are inconsistent with the FACT ACT, 21 U.S.C. § 136a; (2) the statutory interpretation announced in the 2019 Proposed Rule is a departure from longstanding practice and the agency has failed to provide a reasoned explanation for that departure; and (3) APHIS failed to recalculate the reserve surcharge on remand. The Court will consider each argument in turn.

### A.   Statutory Justification for a Reserve

Because plaintiffs challenge the 2020 Final Rule as inconsistent with the terms of the FACT Act, the Court must conduct the two-step <u>Chevron</u> analysis.  <u>See</u> <u>Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.</u>, 719 F. Supp. 2d at 30.

### 1.   <u>Chevron</u> Step One

As Judge Collyer concluded, the "reasonable balance" language of subsection (1)(C), which authorized APHIS to maintain a reserve in the AQI account at Treasury, expired at the end of fiscal year 2002.  <u>See</u> <u>Air Transport I</u>, 303 F. Supp. 3d at 51-52.  The remaining question is whether the expiration of subsection (1)(C) unambiguously withdrew the statutory authority for any and all reserve funds.  To answer that question, the Court looks to the rest of Section 136a.  <u>See</u> <u>Chevron v. NRDC</u>, 467 U.S. at 843 n.9 (stating that at step one, a court may examine the statute's text and the structure of the statute).  Most relevant to the Court's inquiry is 21 U.S.C. § 136a(a)(5) and its link to 21 U.S.C. § 136a(a)(1)(C).  Subsection (5) "established in the Treasury of the United States a fund, to be known as the 'Agricultural Quarantine Inspection User Fee Account', which [contained] all of the fees collected under this subsection . . . through fiscal year 2002."  Subsection (1)(C) authorized APHIS to "maintain a reasonable balance" in subsection (5)'s "Agricultural Quarantine Inspection User Fee Account."  <u>See</u> 21 U.S.C. § 136a(a)(1)(C).  According to APHIS, subsection (5) makes clear that the time limit in subsection (1)(C) governed only the specific AQI account at the Treasury Department.  <u>See</u> Def. Mem. at 21.

To that extent, the Court agrees.  The plain text of subsection (1)(C) authorized the collection of fees to "maintain a reasonable balance" in the Treasury Department AQI Account created by subsection (5) through fiscal year 2002.  The purpose of the 2002 time limit

14

was to set a date at which the funds would be transferred from Treasury to USDA accounts, thus eliminating the need for the AQI account at Treasury.  See 21 U.S.C. § 136a(a)(6) (stating that after fiscal year 2002, the balance of the Treasury AQI account would be credited to the USDA accounts that incurred AQI costs).  When the "reasonable balance" language in subsection (1)(C) expired at the end of fiscal year 2002, authorization was only withdrawn for the reserve fund at Treasury.  Subsection (1)(C) does not contain any language concerning APHIS's "authority to maintain a reserve after the transition."  Def. Mem. at 21.  The plain language of subsection (1)(C) does not, therefore, "directly [speak] to the precise question" of whether expiration of the "reasonable balance" language in that subsection withdrew authorization for all reserve funds. See Chevron v. NRDC, 467 U.S. at 842.  The Court must consider whether any other statutory language, on its face, authorizes maintenance of a reserve.

In the 2020 Final Rule, APHIS relied on 21 U.S.C. §§ 136a(a)(1)(A) and (1)(B) to justify charging fees to maintain a reserve.  See 2020 Final Rule, 85 Fed. Reg. at 2,622. Plaintiffs contend that these subsections do not authorize APHIS to maintain a reserve – only subsection (1)(C) did, and that provision expired in 2002.  APHIS agrees (as it must) that the authority provided by subsection (1)(C) to fund a reserve expired after fiscal year 2002, but it maintains that the plain text of subsections (1)(A) and (1)(B) authorizes it to charge reserve fees. Both plaintiffs and defendants purport to rely on the plain language of Section 136a(a) in support of their respective arguments.

Plaintiffs make three primary points in support of their plain reading argument. First, they rely on the structure and legislative history of the FACT Act.  They point out that, as originally passed, the FACT Act listed the three categories of costs – inspection, administrative, and reserve – within one subsection.  Pl. Mem. at 27.  In 1996, however, Congress amended the

statute and placed each of those categories of costs into separate subsections.  Id.  Compare 21 U.S.C. § 136a(a)(1) with FACT Act of 1990, Pub. L. 101-624, § 2509(a)(4), 104 Stat. at 4070. Plaintiffs argue that by doing so, Congress clarified the "non-overlapping" nature of the three categories.  Pl. Mem. at 27.  They maintain that under the 1996 FACT Act there are "three separate and distinct categories of costs," and that each subsection had a "separate and distinct" purpose.  Id. at 21, 26-27.  In other words, Congress "made explicit that the authority to charge [reserve] fees" was distinct from the authority to charge inspection and administrative fees.  Id. at 22.  Plaintiffs also argue that the 1996 amendments were designed to give APHIS more immediate access to user fees, without having to contend with the appropriations process.  They assert that these changes signaled Congress' belief that APHIS would not continue to need a reserve.  Pl. Mem. at 7, 27.

Second, plaintiffs contend that if the cost of maintaining a reserve was merely an inspection or administrative cost, subsection (1)(C) would have no purpose; it would be rendered superfluous.  Pl. Mem. at 23.  Third, plaintiffs argue that APHIS's reading of the statute would effectively eliminate the requirement that "the amount of the fees is commensurate with the costs of agricultural quarantine and inspection services with respect to the class of persons or entities paying the fees."  21 U.S.C. 136a(a)(2); see Pl. Mem. at 23.  Fees, they maintain, "must correspond to the costs of the AQI program and cannot be set higher than necessary to cover administrative and inspection costs."  Pl. Mem. at 24; see also Pl. Reply and Opp. at 15 (stating that the statute forbids "setting fees at an elevated rate").  They assert that if reserve costs are subsumed within inspection and administrative costs, any time APHIS wishes to increase the amount in the reserve, it need only increase the fees and those fees will remain "commensurate" with costs.  Pl. Reply and Opp. at 6-7.

APHIS responds to each of these arguments in turn.  First, APHIS suggests that Congress may have placed the categories of costs into three separate subsections to avoid the implication that the 2002 time limit applied to all three subsections.  Def. Mem. at 19.  APHIS also asserts that the 1996 amendments were designed only to prevent delays in the remittance of AQI fees and were not an attempt to redefine APHIS's authority to collect a reserve.  Id. at 22-23.  Second, the agency argues that its interpretation does not render subsection (1)(C) superfluous because, through it, Congress created a time-limited AQI User Fee Account in the Treasury.  Id. at 26.  Subsection (1)(C) therefore had a distinct purpose that ended at the end of fiscal year 2002, but it was not intended to be the only subsection that authorized APHIS to collect fees to maintain a reserve.  Third, APHIS points out that Judge Collyer has already held that the agency's reading does not violate the FACT Act's commensurate requirement.  Id. at 38.

APHIS proposes its own plain reading of Section 136a(a), which it says authorizes the maintenance of a reserve.  The agency argues that Congress clearly "intended the temporal limitation [in subsection (1)(C)] to apply only to the authority to maintain a reasonable balance in the *AQI User Fee Account*."  Def. Mem. at 19.  After that subsection expired, APHIS says, subsections (1)(A) and (1)(B) continued to provide statutory authority.  APHIS argues that the reserve (i) is a cost of providing services under subsection (1)(A) because the reserve ensures continuity of AQI services and (ii) is also a cost of administering the program under subsection (1)(B) because the reserve pays for AQI services during the period between when a fee is charged and when it is finally remitted.  Def. Mem. at 17.

The Court agrees with APHIS that neither the history of amendments to the FACT Act, nor the current structure of Section 136a(a), make clear that Congress intended to define the three categories of costs as "non-overlapping."  The Court also agrees that subsection

17

(1)(C) had a purpose independent of providing general authority for a reserve; it authorized maintenance of "reasonable balance" in a specific account at the Treasury Department for a limited period of time.  APHIS's proposed plain reading therefore would not render subsection (1)(C) superfluous.  Finally, the Court agrees that APHIS's reading does not violate the "commensurate" limitation of the FACT Act.  That requirement concerns whether fees are commensurate with the costs to each "class of persons or entities paying the fees."  21 U.S.C. § 136a(a)(2).  It does not concern whether fees are commensurate with costs generally.  The aim of subsection (a)(2), then, is to prevent one class of persons from paying for services provided to a different class of persons.  See Air Transport I, 303 F. Supp. 2d at 52 (defining this practice as "cross-subsidization").  Judge Collyer already concluded that APHIS's practice of generating reserve funds by adjusting user fees proportionally for each class satisfies the "commensurate" requirement in the FACT Act.  Id. at 54.  This Court agrees.

Nonetheless, this Court cannot find that a plain reading of the statute compels the interpretation offered by APHIS.  Subsections (1)(A) and (1)(B) do not include any explicit reference to a reserve fund or reserve costs.  Congress therefore has not explicitly spoken to whether those subsections authorize the maintenance of a reserve fund.  See Chevron v. NRDC, 467 U.S. at 842.  While subsection (1)(C) is no longer operative, no other statutory provision either clearly precludes or clearly authorizes maintenance of a reserve fund.  Congress' intent therefore cannot be clearly discerned from the plain language of Section 136a(a).  The Court therefore finds that the statute is ambiguous as to the question of whether the FACT Act authorizes the maintenance of a reserve fund.  See Chevron v. NRDC, 467 U.S. at 842.  Because the Court concludes that the FACT Act is ambiguous, it must proceed to step two of the Chevron analysis.

2.   <u>Chevron</u> Step Two

Turning to <u>Chevron</u> step two, APHIS argues that its interpretation of the FACT Act, as explained in the 2019 Proposed Rule and finalized in the 2020 Final Rule, is entitled to deference.  Def. Mem. at 25.  Plaintiffs do not directly respond to this argument or present an argument that any ambiguity supports their reading of the statute.  They contend only that <u>Chevron</u> deference is inappropriate because the FACT Act is unambiguous.  <u>See</u> Pl. Mem. at 25-26; Pl. Reply and Opp. at 14-15.  But the Court has already concluded, <u>supra</u> Section III(A)(1), that the FACT Act is ambiguous because there are multiple reasonable interpretations of the statute.  It therefore must now consider whether the agency's interpretation is entitled to deference under <u>Chevron</u> step two.

"Substantial deference is accorded to the interpretation of the authorizing statute by the agency authorized with administering it."  <u>Rust v. Sullivan</u>, 500 U.S. at 184.  The Court will defer to an agency's interpretation if it is a "permissible construction of the statute." <u>Chevron v. NRDC</u>, 467 U.S. at 843.  It need not be the best, <u>see</u> <u>United States v. Haggar Apparel Co.</u>, 526 U.S. at 394, or only possible, <u>see</u> <u>Rust v. Sullivan</u>, 500 U.S. at 184, interpretation the agency could have adopted.  If the agency's view is reasonable, the Court will defer to it.  <u>See</u> <u>Pauley v. BethEnergy Mines, Inc.</u>, 501 U.S. at 702.

In the 2019 Proposed Rule, later finalized in the 2020 Final Rule, APHIS explained that subsections (1)(A) and (1)(B) "provide adequate authority to continue setting user fees in amounts to maintain the AQI Reserve."  <u>See</u> 2019 Proposed Rule, 84 Fed. Reg. at 17,730. Invoking subsection (1)(A), it explained that the "reserve fund allows the program to ensure the continuity of services even under . . . service constraints, [such as those caused by the terrorist attacks of September 11, 2001,] and therefore constitutes a cost of providing . . . services, as permitted by subsection [(1)(A)]."  <u>Id.</u> at 17,731.  APHIS further explained that there are certain

19

costs, "such as upgrading facilities and replacing broken equipment," that "are not recurring costs and are therefore impossible to account for as line items" in the budget.  Id.  These costs, however, are still incurred "in connection with" the AQI program.  See 21 U.S.C. § 136a(a)(1)(A).  APHIS stated that the reserve ensures that the agency will be able to pay these costs.

APHIS also explained in the 2019 Proposed Rule that subsection (1)(B) authorizes maintenance of a reserve because APHIS incurs "costs required to run the AQI program, which may go over and beyond the specific operational costs of a particular inspection but nonetheless fall within the scope of operating the [AQI] program."  2019 Proposed Rule, 84 Fed. Reg. at 17,731.  Without the reserve, APHIS explained, these costs could not consistently be met due to the three-month delay in fee remittances.  Id.  Collecting fees to cover these costs therefore "reasonably constitutes 'the costs of administering this subsection.'"  Id. (citing 21 U.S.C. § 136a(a)(1)(B)).  Finally, the rule stated that sometimes "fees are not collected at all even though the services have already been performed."  Id.  In these instances, "a reserve is essential to prevent the AQI program from running a deficit, which could result in . . . interruptions in service."  Id. (discussing the administrative needs of the AQI program).

The Court concludes that APHIS's interpretation is a permissible construction of the statute.  Together, subsections (1)(A) and (1)(B) authorize the collection of fees sufficient to cover the costs incurred by the AQI program.  Given the delays in remitting fees, the possibility of sudden slowdowns in user fees, and the existence of non-recurring costs, APHIS has determined that a reserve is necessary to fully and consistently cover AQI costs.  The agency's determination is reasonable.  This is particularly true in light of the policy objectives of the FACT Act.  See Northpoint Tech. Ltd. v. FCC, 412 F.3d at 151 (a permissible interpretation is

one that explains how an agency's interpretation serves the statute's objectives).  As the parties

agree, Congress enacted subsections (1)(A) and (1)(B) to provide APHIS with more immediate

access to user fees.  See Pl. Mem. at 28; Def. Mem. at 22-23.  A reserve fund ensures that APHIS

will have access to these fees even if unforeseen circumstances arise.  The agency's

interpretation therefore is consistent with the statutory purpose.  See Bell Atl. Tel. Cos. v.

FCC, 131 F.3d at 1049.

APHIS's interpretation of the FACT Act, as explained in the 2019 Proposed Rule

and finalized in the 2020 Final Rule, is reasonable.  The Court will defer to that interpretation.

### B.  Longstanding Agency Practice

Separate and apart from their Chevron argument, plaintiffs argue that the 2020

Final Rule is arbitrary and capricious for two reasons.  First, APHIS's reliance on subsections

(1)(A) and (1)(B) is inconsistent with the agency's longstanding practice of relying on subsection

(1)(C) to justify the reserve.  Pl. Mem. at 30-32.  Second, APHIS failed to provide a reasoned

explanation for its departure from this longstanding practice.  Id. at 32-36.  The Court will

address each argument in turn.

### 1.  APHIS's reliance on subsection (1)(C)

Plaintiffs assert that APHIS has a "20-year practice of relying on only the

'reasonable balance' provision in § 136a(a)(1)(C) to justify its reserve surcharge."  Pl. Mem.

at 29, 31-32.  APHIS responds that it has never explicitly relied on or cited to any subsection of

the FACT Act, but instead has always implicitly relied on the functional rationales of subsections

(1)(A) and (1)(B) to justify the reserve.  It states that the 2020 Final Rule simply clarified the

statutory authority on which the agency has always relied.  Def. Mem. at 30-35; Def. Reply

at 15-18.  Both parties point to the history of regulatory rulemakings to support their arguments.
A brief review of the regulatory history therefore is necessary.

APHIS first established AQI user fees in 1991.  See User Fees, 56 Fed.
Reg. 14,837, 14,841 (Apr. 12, 1991) ("1991 Rule").  In the 1991 Rule, APHIS stated that its
authority to collect reserve fees derived from the FACT Act's language "allow[ing] for a
'reasonable' balance in the AQI user fee account."  Id. at 14,842; see also Air Transport I, 303 F.
Supp. 3d at 51 ("The phrase 'maintain a reasonable balance' [in the FACT Act of 1990] was
understood to authorize APHIS to create a reserve fund.").  The agency again used the
"reasonable balance" language in a 1992 interim rule.  See User Fees—Agricultural Quarantine
and Inspection Services, 57 Fed. Reg. 62,468 (Dec. 31, 1992) ("1992 Interim Rule").  That rule
explained that user fees "included an amount that would provide for a reasonable balance in the
AQI User Fee Account."  Id. at 62,470.  It also equated a "reasonable balance" with a "reserve."
Id. at 62,471 (stating that "a reasonable balance, or reserve, [was] one-quarter of the annual costs
of providing AQI services").  In two more rules prior to 2002, APHIS continued to rely on the
FACT Act's grant of authority to "maintain a reasonable balance in the Agricultural Quarantine
Inspection User Fee Account."  User Fees; Agricultural Quarantine and Inspection Services, 62
Fed. Reg. 39,747, 39,747 (July 24, 1997) ("1997 Rule"); see also User Fees; Agricultural
Quarantine and Inspection Services, 64 Fed. Reg. 62,089, 69,092 (Nov. 16, 1999) ("APHIS' user
fee authority provides for the maintenance of a reasonable balance in the user fee account.").

APHIS argues that, prior to the 2019-20 rulemaking now at issue, it had "never
specifically cited any statutory authority for maintaining the reserve."  Def. Mem. at 31-32.
While it is true that the agency never explicitly mentioned 21 U.S.C. § 136a(a)(1)(C), the Court
concludes that the agency did in fact rely upon subsection (1)(C) in its pre-2002 rulemakings.

The 1991 Rule quoted subsection (1)(C) of the FACT Act.  See 1991 Rule, 56 Fed. Reg.

at 14,842 ("The [FACT Act] also allowed for a 'reasonable' balance in the AQI user fee

account.").  The 1992 Interim Rule referred to a reasonable balance in the "AQI User Fee

Account," the name given to the account created by subsection (5) and referenced in subsection

(1)(C).  1992 Interim Rule, 57 Fed. Reg. at 62,470.  Finally, in an obvious reference to

subsection (1)(C), the 1997 Rule directly referred to the text of the FACT Act.  See 1997 Rule,

62 Fed. Reg. at 39,747 ("The [FACT Act], as amended, further states that the fees should be

sufficient . . . to maintain a reasonable balance . . . .") (emphasis added).  Of course, the agency's

reliance on the "reasonable balance" language prior to 2002 was entirely appropriate because

subsection (1)(C) had not yet expired, so APHIS could justifiably rely on its language.  But

Section 136a(a)(1)(C) did not give APHIS authority to charge user classes to maintain a reserve

account after the end of fiscal year 2002.  See Air Transport I, 303 F. Supp. 3d at 52.  With

respect to the "longstanding agency practice" argument, then, the question is whether APHIS

continued to rely on the "reasonable balance" language after 2002.

       In 2004, APHIS published its first rule since the expiration of subsection (1)(C)'s

"reasonable balance" language.  See User Fees for Agricultural Quarantine and Inspection

Services, 69 Fed. Reg. 71,660 (Dec. 9, 2004) ("2004 Interim Rule").  In that rule, APHIS stated

that the FACT Act permitted the agency to collect user fees to "recover the costs of . . .

[p]roviding the AQI services . . . , [p]roviding preclearance or preinspection at a site outside the

customs territory of the United States . . . , and [a]dministering the user fee program."  Id.

at 71,660.  Notably, this recitation of the FACT Act's grants of authority did not include the

"reasonable balance" language of subsection (1)(C).  Plaintiffs point out, however, that the 2004

Interim Rule "justif[ied] the surcharge based on the 'need to maintain a reasonable reserve

balance in the AQI account.'"  Pl. Mem. at 31-32 (citing 2004 Interim Rule, 69 Fed. Reg. at 71,664).  They argue that the use of the phrase "reasonable reserve balance" shows that APHIS was relying on subsection (1)(C).

   The Court is not persuaded because the 2004 Interim Rule goes on to explain that the "reserve fund provides [APHIS] with a means to ensure the continuity of AQI services."  2004 Interim Rule, 69 Fed. Reg. at 71,664.  This reasoning does not sound in subsection (1)(C), nor does the rule quote or otherwise clearly refer to subsection (1)(C). Moreover, the 2004 Interim Rule also uses phrases like "reasonable amount," id. at 71,661, and "reasonable level," id. at 71,666, to describe the level at which the reserve should be maintained. The use of the word "reasonable" does not, by itself, show that APHIS was relying on subsection (1)(C).  This is particularly true in light of the fact that, when explaining the FACT Act's grants of authority, the 2004 Interim Rule excluded any reference to the language of subsection (1)(C). Compare 2004 Interim Rule, 69 Fed. Reg. at 71,660, with 1997 Rule, 62 Fed. Reg. at 39,747 (stating that the FACT Act authorizes APHIS to collect fees to cover the cost of AQI services, the cost of administering the fee program, and the cost to maintain a reasonable balance in the AQI account).

   In 2006, APHIS issued a final rule affirming the 2004 Interim Rule.  User Fees for Agricultural Quarantine and Inspection Services, 69 Fed. Reg. 49,984, 49,985 (Aug. 24, 2006) ("2006 Final Rule").  The 2006 Final Rule did not justify the reserve by implicit or explicit reference to subsection (1)(C).  In response to comments arguing that the reserve amount should be smaller, APHIS stated only that "a reasonable reserve[, which] is one quarter of the annual costs of providing an AQI service[,] . . . is needed to ensure continuity of AQI

24

services." Id. at 49,985.  Again, the use of the word "reasonable" does not, by itself, show

reliance on subsection (1)(C).

APHIS did, however, return to its reliance on subsection (1)(C) in its 2014

proposed rule.  That 2014 proposed rule stated:  "According to the FACT Act, as amended,

[AQI] user fees should recover the costs of: [p]roviding the AQI services . . . ; [a]dministering

the user fee program; and [m]aintaining a reasonable reserve."  User Fees for Agricultural

Quarantine and Inspection Services, 79 Fed. Reg. 22,895, 22,896 (Apr. 25, 2014) ("2014

Proposed Rule") (emphasis added); see also User Fees for Agricultural Quarantine and

Inspection Services, 80 Fed. Reg. 66,748, 66,748 (Oct. 29, 2015) ("2015 Final Rule") (same).

As Judge Collyer found, this language mimics both the structure and the precise language of

Section 136a(a)(1)(C):  "In the 2014-15 rulemaking, APHIS relied on the 'reasonable balance'

allowance in § 136a(a)(1)(C)."  Air Transport I, 303 F. Supp. 3d at 52.  She concluded that such

reliance was inappropriate because that language – and the authority provided by it – had expired

in 2002.  Id.

In sum, before 2002, APHIS relied on the "reasonable balance" language of

subsection (1)(C).  This was permissible because that subsection had not yet expired.  After the

expiration of subsection (1)(C), APHIS ceased relying on that statutory grant until 2014, at

which time it resumed its reliance on subsection (1)(C).  Only after Judge Collyer concluded that

subsection (1)(C) no longer authorized the maintenance of a reserve did APHIS begin to

explicitly rely upon subsections (1)(A) and (1)(B) to justify the reserve.

Based on this regulatory history, the Court must conclude that the agency has had

no "longstanding" practice of relying on subsection (1)(C) to justify the reserve.  Courts have

considered agency interpretations to be longstanding when they have been in place for decades.

See, e.g., Menkes v. U.S. Dep't of Homeland Sec., 637 F.3d 319, 332 (D.C. Cir. 2011)

(thirty-three years); Barnhart v. Walton, 535 U.S. 212, 219 (2002) (thirty-nine years);

Bankamerica Corp. v. U.S., 462 U.S. 122, 130 (1983) (sixty years).  But see Anderson Shipping

Co. v. EPA, 852 F.2d 1387, 1391 (D.C. Cir. 1988) (concluding that an agency's seventeen-year

interpretation was longstanding).  Here, APHIS has not consistently applied any interpretation

for more than eleven years.  First, APHIS appropriately relied on subsection (1)(C) from 1991

to 2002.  Then, with the expiration of that subsection, the interpretation changed; from 2003

to 2014, APHIS discontinued its reliance on subsection (1)(C).  Its interpretation then changed

back to subsection (1)(C) in 2015 and finally to subsections (1)(A) and (1)(B) in 2020.  Such an

inconsistently applied interpretation cannot be considered "longstanding."  See, e.g., Am. Mining

Cong. v. U.S. EPA, 824 F.2d 1177, 1182 (D.C. Cir. 1987) (concluding that an interpretation that

changed three times between 1980 and 1985 was "neither a consistent nor a longstanding agency

interpretation").  The Court therefore rejects plaintiffs' contention that APHIS has always relied

on subsection (1)(C).

          For the same reasons, the Court rejects APHIS's contention that it has always

relied on subsections (1)(A) and (1)(B) to justify the reserve.  Assuming that APHIS had

implicitly relied on subsections (1)(A) and (1)(B) from 2003 to 2014 – a question the Court need

not resolve here – that interpretation has also not been consistently applied for long enough to be

considered longstanding.  The Court therefore concludes that APHIS has no longstanding agency

practice of relying on any particular subsection of the FACT Act to justify the reserve.  It

therefore cannot have broken from any such practice, as plaintiffs contend, when it issued the

2020 Final Rule.

2.  Adequate explanation

Although this Court concludes that there is no longstanding agency practice from which the 2020 Final Rule departed, the agency must still be able to provide a reasoned explanation for its decision to explicitly rely upon subsections (1)(A) and (1)(B) for the first time.  To do so, APHIS must "show that there are good reasons for the new policy" and "display awareness that it is changing position."  See FCC v. Fox Television Stations, Inc., 556 U.S. at 515.  APHIS has done so here.

As explained supra, Section III(A)(2), because this Court concluded that Section 136a(a) is ambiguous, APHIS is entitled to deference under Chevron if its interpretation of the statute is reasonable.  This Court concluded that the agency's interpretation is reasonable and therefore defers to that interpretation.  Likewise, the Court concludes that APHIS has offered a sufficiently "reasoned explanation" for its decision to explicitly rely on subsections (1)(A) and (1)(B).  See FCC v. Fox Television Stations, Inc. 556 U.S. at 515.  Indeed, the 2019 Proposed Rule provides much more than a "brief statement," which is all that is necessary for this Court to conclude that APHIS has adequately explained its action.  See Mashpee Wampanoag Tribe v. Bernhardt, 466 F. Supp. 3d at 214.  The 2019 Proposed Rule, later finalized in the 2020 Final Rule, "clarified that subsections 136a(a)(1)(A) and (B) of the FACT Act provide adequate authority" to APHIS to maintain a reserve.  See 2019 Proposed Rule, 84 Fed. Reg. at 17,730.  It reasoned that a reserve is necessary to ensure continuity of AQI services, to maintain full operations, and to cover the cost of administering the subsection in the event of bad debt, slow fee collection, or other unforeseen circumstances.  Id. at 17,731.  This satisfies the requirements of the APA.

APHIS has also "display[ed] awareness that it is changing position."  FCC v. Fox Television Stations, Inc. 556 U.S. at 515.  The 2019 Proposed Rule referenced Judge Collyer's

decision that "congressional authority under [subsection (1)(C)] to maintain a reasonable balance in the reserve account expired in 2002." 84 Fed. Reg. at 17,729. It then acknowledged that the 2014 Rule "could lead to an interpretation . . . that APHIS was, in fact, relying on [subsection (1)(C)]," and thus clarified its statutory authority "[i]n light of the Court's remand." Id. at 17,730. This is an adequate acknowledgement that the agency was changing its position. Plaintiffs argue that "grudgingly recognizing that [the] Court ordered [APHIS] to shift its policy is not enough to satisfy the APA's requirements." Pl. Reply and Opp. at 22. The Court disagrees. There is no serious question about whether APHIS knew it was making a change. Judge Collyer remanded the reserve portion of the rule for the specific purpose of identifying a new statutory provision that could justify APHIS's maintenance of a reserve. Whether the agency carried out this charge grudgingly or with great enthusiasm is of no moment. All that the APA requires is that APHIS not do so "*sub silentio*." FCC v. Fox Television Stations, Inc., 556 U.S. at 515. The Court concludes that APHIS satisfied this requirement.

Plaintiffs rely on a line of cases under which "[a]n agency's failure to come to grips with conflicting precedent constitutes 'an inexcusable departure from the essential requirement of reasoned decisionmaking.'" Ramaprakash v. FAA, 346 F.3d at 1125 (quoting Columbia Broad Sys. v. FCC, 545 F.2d 1018, 1027 (D.C. Cir. 1971)); see also NLRB v. CNN Am., Inc., 865 F.3d 740, 751 (D.C. Cir. 2017), Northpoint Tech., Ltd. v. FCC, 412 F.3d at 156. Plaintiffs argue that these cases require APHIS to offer "a thorough and well-reasoned explanation for [its] new statutory interpretation." Pl. Mem. at 33. But as APHIS correctly points out, "to the extent Ramaprakash is read to support an argument that a change in position requires a more extensive explanation [than any other agency action], the Supreme Court in [FCC v. Fox Television Stations Co.] . . . rejected that position." Def. Mem. at 37-38 n.13.

Courts apply the same standard whether an agency action changes prior policy or adopts a brand new policy.  See <u>FCC v. Fox Television Stations Co.</u>, 556 U.S. at 515.

Moreover, the cases on which plaintiffs rely are distinguishable from this case. Those cases concern adjudicatory decisions of administrative bodies.  In each case, the question was whether the administrative body deviated from established precedent.  See <u>Ramaprakash v. FAA</u>, 346 F.3d at 1125-29 (analyzing whether the National Transportation Safety Board ignored prior rulings on similar facts); <u>Northpoint Tech., Ltd. v. FCC</u>, 412 F.3d at 152-53 (determining that the Federal Communications Commission mischaracterized and contravened a prior ruling); <u>NLRB v. CNN Am., Inc.</u>, 865 F.3d at 403-04 (holding that the National Labor Relations Board failed to acknowledge and grapple with its prior cases).  The standards laid out in those cases therefore are most relevant to agency adjudicatory decisions.  Because APHIS's action in this case was a rulemaking, these cases do not provide the Court with a useful analytical framework.

The Court concludes that APHIS has provided an adequate explanation for its reliance on subsections (1)(A) and (1)(B).  The 2020 Final Rule is not arbitrary or capricious.

### C.  Scope of the Remand

Finally, plaintiffs argue that APHIS acted arbitrarily and capriciously when it changed its statutory justification for a reserve to subsections (1)(A) and (1)(B) without also recalculating the reserve surcharge as an inspection or administrative cost and publishing the relevant data and calculations.  Pl. Mem. at 36-37.  It maintains that "[u]ntil APHIS explains how it calculated the reserve fee as an inspection or administrative cost, it cannot justify the fee under those subsections."  Pl. Reply and Opp. at 23.  Because it did not do so, plaintiffs contend, "APHIS cannot be certain that it is complying with the [commensurate requirement in the] FACT Act, which . . . prohibits APHIS from charging a class of users a fee that subsidizes the

services provided to a different class of user." Pl. Mem. at 40. APHIS responds that this issue is beyond the scope of Judge Collyer's remand to the agency, which, it says, was "quite limited in scope." Def. Mem. at 38. APHIS "satisfied the Court's charge" by identifying operative statutory language that justifies a reserve fund. Id.

The Court agrees with APHIS. Judge Collyer remanded the rulemaking "to APHIS for reconsideration of its [statutory] authority to charge a surcharge for a reserve account." Air Transport I, 303 F. Supp. 3d at 57 (emphasis added). APHIS was required only to determine if any other statutory language supported charging a reserve fee. A wholesale recalculation of AQI fees is beyond the scope of the remand, as Judge Collyer said nothing about recalculating fees.

Judge Collyer was aware, based on the parties' briefing before her, that APHIS might identify a different statutory provision justifying the reserve. See Air Transport II, 317 F. Supp. 3d at 392 ("Rather, the agency represents that there is support for its authority to set a reserve fee elsewhere in the statute."). She even understood which provisions APHIS was most likely to identify. See Air Transport I, 303 F. Supp. 3d at 50 (discussing APHIS's attempt to rely on subsection (1)(B)). Nonetheless, she did not hold that APHIS would be required to recalculate fees, nor did she reserve that question for later consideration. Instead, she held that APHIS's method of funding the reserve account "by a proportional percentage increase in the fee charged to all user classes . . . is consistent with the commensurate requirement in the [FACT] Act." Id. at 54. Clearly, she did not foresee a change in statutory justification impacting her cross-subsidization holding. See id.

When plaintiffs asked Judge Collyer to vacate the 2015 Final Rule, they made an argument almost identical to the one they make here. Plaintiffs argued that APHIS would not be

able to provide a statutory justification for the reserve fund "by merely citing a different statutory provision," but would instead need to "revisit . . . the way it identifies and allocates costs between operational, administrative, and imputed activities, and then calculate new fee levels." Plaintiffs' Reply in Support of their Motion to Amend March 28, 2018 Order [Dkt. No. 40] at 5; see also Air Transport II, 317 F. Supp. 3d at 391.  Judge Collyer, however, concluded that APHIS had adequately shown that there was a "'significant possibility' that it [would] be able to explain its [statutory] authority to collect a reserve fee on remand."  Id. at 392.  In other words, she concluded that vacatur was inappropriate because APHIS likely would be able to justify its maintenance of a reserve – and complete the remand – by "merely citing a different statutory provision."

The Court concludes that APHIS has satisfied the limited requirements of the remand order.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment [Dkt. No. 63] and deny Plaintiffs' Motion for Summary Judgment [Dkt. No. 61].  An Order consistent with this Opinion will issue this same day.

SO ORDERED.

 /s/
PAUL L. FRIEDMAN
United States District Judge

DATE: March 26, 2021